JULIAN SAPHIER *vs.* DEVONSHIRE STREET FUND, INC.
(and a companion case[1]).

Suffolk.    April 7, 1967. — June 8, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
& REARDON, JJ.

*Appraisal. Investment Company. Practice, Civil,* Case stated. *Words,*
"Last quoted bid price."

In an action heard upon a case stated, it was the duty of the trial judge
and of this court to order the correct judgment on the agreed facts.
[684]

Under a prospectus of an open-end diversified investment company con-
stituting a contract between the company and an investor therein,
whereby he deposited with a bank as the company's escrow agent and
custodian shares of a certain "over-the-counter" stock owned by him to
be exchanged for redeemable shares of the investment company, and
the deposited shares were to be appraised by the bank "at the last
quoted bid price thereof known to" it on the "effective date of the ex-
change," an appraisal by the bank of the investor's stock at the "median"
price of five bid prices therefor set out on the "National Quotation
Sheet" of "over-the-counter" stocks for the last business day preceding
the exchange date was not improper or unreasonable where it appeared
that the sheet did not set out the order in which, or the time at which,
such prices were quoted [691, 693]; the bank in the circumstances was
not bound to an interpretation of the prospectus as calling for an ap-
praisal of the investor's deposited shares at the highest of the five bid
prices by reason of a certain method of appraisal used by it about two
years later when it redeemed the investor's shares and paid the redemp-
tion price by issuing to him shares of the same "over-the-counter" stock.
[691]

G. L. c. 106, § 2–305 (3) was inapplicable where a contract between an
investment company and an investor therein provided that an appraisal
of the stock of the investor exchanged for shares of the company should
be made by a bank as the company's escrow agent and custodian at "the
last quoted bid price . . . [of the investor's stock] known to" the bank,
and it made a proper and reasonable appraisal under that provision.
[691–692]

TWO ACTIONS OF CONTRACT. Writs in the Superior Court
dated December 26, 1962.

The actions were heard by *Smith,* J.

[1] Sidney Shore *vs.* Devonshire Street Fund, Inc.

*Loyd M. Starrett (John G. S. Flym & Judith L. Olans* with him) for the plaintiffs.

*Warren F. Farr* for the defendant.

CUTTER, J. Two actions of contract present on almost identical facts, the issue whether in July, 1961, a Boston bank (the bank), as the custodian of the defendant (Fund), properly placed a valuation upon securities deposited by the plaintiffs in anticipation of the issue to them of shares of Fund in exchange for such securities. Recovery is sought of the amount of alleged undervaluations of the deposited securities.

The cases were heard upon statements of agreed facts constituting cases stated. The trial judge ordered judgments for Fund and the plaintiffs now present to us their exceptions to those orders. Our duty is to order the correct judgments on the cases stated. See *Commonwealth* v. *Alleged Gaming Apparatus,* 335 Mass. 223, 225; *Quintin Vespa Co. Inc.* v. *Construction Serv. Co.* 343 Mass. 547, 551–552.

Fund, a Massachusetts corporation, "is an open-end diversified investment company with redeemable shares." See Loss, Securities Regulation (2d ed.), 144–153. On February 14, 1961, it offered shares of "Fund in exchange for securities of the general nature specified . . . in the prospectus or other [acceptable] securities."[2] Prospective investors were required to deposit their securities by June 12, 1961. The bank was named as escrow agent as well as custodian. Fund was to exchange its shares for deposited securities as of an "effective date of the ex-

---

[2] Fund in many respects was similar to other "open-end" investment trusts designed to give shareholders units or shares representing a proportional beneficial interest in a diversified, commingled fund of investment securities. Fund's arrangements, however, contained special provisions to make available to owners of securities with a low tax basis for Federal income tax purposes a chance to take advantage of an Internal Revenue Service ruling "that no federal capital gains tax liability" would be incurred upon the proposed "exchange, except to the extent of any cash paid in lieu of a fractional share." See Int. Rev. Code of 1954, § 351, as amended November 13, 1966, by Public Law 89–809, Title II, § 203 (a), (b), 80 Stat. 1577 (limiting future non-recognition of capital gains for such funds); 89th Cong. 2d Sess. Sen. Rep. No. 1707, and Conf. Rep. No. 2327; Chirelstein, Tax Pooling and Tax Postponement — The Capital Exchange Funds, 75 Yale L. J. 183; 1967 C.C.H. Standard Federal Tax Reporter, par. 276.55.

change'' to be fixed by Fund. In effect each depositor was to receive (with the same tax basis) Fund shares representing an indirect undivided interest in Fund's diversified, commingled securities in place of such depositor's direct ownership of the low tax basis (fn. 2) securities deposited by him. The number of Fund's shares to be issued to each shareholder was to be determined by dividing ''the market value of . . . [each shareholder's] deposited securities'' by $12.50 which was the issue price of each Fund share.[3]

Once Fund became operative, its shareholders were to ''have the right to redeem their shares at net asset value by the deposit of the certificate therefor . . . with a written request for redemption.'' The prospectus[4] stated (a) that the ''net asset value of . . . Fund's shares will be determined as of the close of [Exchange] business . . . on each day on which the Exchange is open,'' and also (b) that, ''[a]lthough it is contemplated that the redemption price will normally be paid in cash,'' Fund may ''pay the redemption price . . . by a distribution in kind of portfolio securities in lieu of cash, if . . . management . . . [deems it] advisable.'' The prospectus provisions governing valuation of securities exchanged for Fund shares upon the issue of those shares, or upon their later redemption, are set out in the margin.[5]

---

[3] Each shareholder thus would receive (apart from minor cash adjustments for fractional shares, transfer taxes, and fees) that portion of Fund's total shares, which (a) the then value of his deposited securities, determined in accordance with the prospectus, bore to (b) the value thus determined of all the deposited securities of all of Fund's original shareholders. The arrangements for redemption of Fund's shares (fn. 5) were apparently designed to preserve for each Fund shareholder his proportional indirect interest (in relation to other shareholders) in Fund's total assets for the time being despite redemptions or changes in Fund's assets. See analogy of common trust funds, G. L. c. 203A; Scott, Trusts (2d ed.) § 227.9; Bogert, Trusts and Trustees (2d ed.) §§ 677, 1141.

[4] There was a further provision, ''If proper tender is made prior to 12: 00 noon . . . on a day on which the New York Stock Exchange is open . . . net asset value will be computed as of the close of . . . [the] Exchange . . . otherwise as of the [Exchange] close . . . on the next day . . . it is open.''

[5] (a) The prospectus, under the heading ''Determination of Net Asset Value,'' provided in part (emphasis supplied): ''For the purpose of determining the redemption price, the net asset value per share will be calculated

Saphier v. Devonshire Street Fund, Inc.

On February 28, 1961, Saphier and Shore deposited, with the bank as escrow agent, 5,385 shares and 4,506 shares, respectively, of Class A common stock of Cole National Corporation (Cole) "to be exchanged for shares of . . . Fund in accordance with . . . [the] prospectus." July 25, 1961, became the "effective date of the exchange" described in the prospectus. The last prior business day was July 24.

Cole shares, after January 1, 1961, were not listed on the New York or the American stock exchanges. "The only published source of market quotations for Cole . . . stock as of any date since January 1, 1961 was a National Quotation Sheet [the so called "pink sheet"] . . . published by National Quotation Bureau, Inc. on each business day. The . . . [s]heet sets out the quoted bid and asked prices on . . . [many "over-the-counter"] stocks . . . . [I]t lists each security . . . quoted on the date of the . . . [s]heet and gives the names of persons quoting on such security together with the bid and asked prices quoted. Such price quotations are ascertained by the Bureau . . . at approximately 1:00 P.M. of . . . the date of the . . . [s]heet. . . . [T]here is no indication on the sheet itself from which one could ascertain the order in which . . . the several bid prices were quoted."

The National Quotation Sheet dated July 24, 1961, set out

by dividing the value of all securities and other assets, less liabilities, by the total number of shares outstanding. All securities listed on the New York or American Stock Exchanges will be valued at the last quoted sale price thereof on such Exchange, or if no known sale has been made within three days *to the knowledge of the person or persons making such determination,* then at the last quoted bid price . . . on such Exchange. [A] *Other securities for which market quotations are readily available* shall be appraised at the *last quoted bid price thereof* [B] *known to the person or persons making such determination,* and other securities and assets will be appraised at their fair value *as determined by or pursuant to the authority of the Board of Directors.* [C] *The Fund's Custodian Agreement provides that such valuations will be made by the Custodian* [the bank]." The letters in brackets in the preceding quotation are merely for convenient reference to the language immediately following such letters respectively.

(b) A separate provision of the prospectus stated that, for the determination of the number of Fund shares to be issued in exchange for deposited securities, the "market value of the deposited securities will be determined by . . . Fund in the same manner as is provided with respect to the valuation of . . . Fund's portfolio securities as described under 'Determination of Net Asset Value.'" See par. (a) of this fn. 5.

bid and asked prices for Cole stock quoted on July 24, 1961, by five dealers.

|  | Bid | Asked |
|---|---|---|
| Dealer A | 30 | 30½ |
| ,, B | 29½ | 30½ |
| ,, C | 29½ | 31 |
| ,, D | 29¾ | 30¾ |
| ,, E | 29½ | 31 |

"These were the last bid prices quoted for . . . [Cole] stock on July 24, 1961 known to" the bank as Fund's escrow agent and custodian and to Arthur Young & Company, independent certified public accountants, the firm which served as Fund's auditors (Fund's auditors). The bank and Fund's auditors did not know, the order in which, or the time at which, these bids were quoted on July 24, 1961.

The market value of deposited securities as of July 24, 1961, was determined by the bank as custodian. This determination was reviewed by Fund's auditors. Securities traded over the counter were valued on the basis of bid prices for July 24, 1961, as reported in the National Quotation Sheet. In determining the market value of Cole stock as of July 24, 1961, the bank took the five bid prices already mentioned, arranged them in order from the highest to the lowest (i.e. 30, 29¾, 29½, 29½, 29½) and selected the "median" (middle or third figure), i.e. 29½. On the basis of a market value of 29½ per share, the total value of the 5,385 shares of Cole deposited by Saphier for exchange was determined to be $158,837.50.[6]   On September 1, 1961, Fund issued to Saphier 12,253 shares of Fund, valued at $12.50 a share, and made a cash payment of $10.16 in lieu of a fractional share. The process of valuation of Shore's deposited Cole stock (and of the issue of Fund shares) was the same as that followed with respect to Saphier's deposited stock.

---

[6] In accordance with the prospectus there were deducted a dealer-manager fee of $5,560, Federal and State transfer taxes in the amount of $63.56, and an original issue tax of $61.28.

About September 1, 1961, Fund sent out a "Report to Shareholders," containing an audited financial statement of Fund at the exchange date, July 25, 1961. On September 18, 1961, Fund's board of directors voted to adopt and confirm the valuation of securities set forth in that statement. Saphier and Shore promptly protested Fund's determination of the value of their Cole stock by a letter dated October 2, 1961. They have never withdrawn their protest.

Saphier or Shore tendered for redemption shares of Fund on eighteen different dates between June 20, 1963, and January 14, 1964. "Fund exercised its right to pay the redemption price in kind by a distribution of Cole . . . stock held by . . . Fund." Representative redemptions and the relevant circumstances are set out in the margin.[7] Each valuation of Cole stock was determined by the bank as custodian on the basis of bid prices furnished to it by Fund's "dealer-manager" (a brokerage and investment security firm) "which derived . . . [the] prices from . . . National Quotation Sheet."

The parties have stipulated that, if the market value of Cole shares "as of July 24, 1961, determined as provided in the prospectus . . . was $30 per share . . . Saphier is entitled to recover $2,506.40 plus interest . . . from July 24,

| [7]  Tender Date | Number of Fund Shares Tendered | Valuation Date | Net Asset Value each Fund Share | Number Cole Shares Distributed | Value per Cole Share | Bids on Valuation Date |
|---|---|---|---|---|---|---|
| 1963 June 20 | 200 | 1963 June 21 | $10.07 | 105 | $18,875 | 3 @ 18 ⅞ 2 @ 18 ⅝ 2 @ 18 ¾ |
| Dec. 10 | 1,000 | Dec. 10 | 10.01 | 476 | 21.00 | 2 @ 21 4 @ 20 ¾ |
| 1964 Jan. 14 | 953 | 1964 Jan. 14 | 10.27 | 501 | 19.50 | 3 @ 19 ½ 2 @ 19 1 @ 19 ¼ |

On seven occasions 1,000 shares of Fund were redeemed. One redemption, as noted above, was of 953 shares. One was of 600 shares. The others ranged from ninety shares to 200 shares. The highest number of Cole shares paid out by Fund in any one redemption was 502 shares. On all but two occasions (October 23 and November 22, 1963) redemptions were at the high "pink sheet" quotation for the relevant day.

1961, and . . . Shore is entitled to recover $2,096.70 plus interest'' from that date.[8]

1.   The parties' contract is the prospectus which, in effect, was incorporated by reference in the letters of transmittal depositing the plaintiffs' Cole stock with the bank as Fund's escrow agent.   The pertinent valuation provision is that in fn. 5, par. (a), at point [A] (emphasis supplied), ''Other securities [not listed on an exchange] for which market quotations are readily available shall be appraised at the *last quoted bid price* thereof [B] known to the person . . . making such determination.''   Closely related is the provision, at point [C], that ''Fund's Custodian Agreement provides that such valuations will be made *by the Custodian*'' (emphasis supplied).

It will be noted that the valuation process is not to ascertain ''fair market value,'' but to determine the ''last quoted bid price . . . known to the person . . . making such determination.''   Accordingly, decisions dealing with valuation at ''fair market value'' for estate, gift, and inheritance tax purposes (see authorities referred to in *Boston Safe Deposit & Trust Co.* v. *Stone,* 348 Mass. 345, 350) are not directly relevant but are useful only by way of analogy. The present valuation issue is also different, in terms of what is to be determined, from the statutory valuation process mentioned in *Martignette* v. *Sagamore Mfg. Co.* 340 Mass. 136, for here what is to be determined is not ''value'' but (as noted above) the ''last quoted bid price.''

There is no dispute about what facts were (see fn. 5, point [B]) ''known to the person . . . making such determination.''   The bank, as escrow agent and custodian, knew all five of the bids listed for July 24, 1961, and had before it a range of bids, from a high of $30 a share to a low of $29.50 a share.

---

[8] Nothing in the cases stated leads us to infer that Fund's management or custodian had acted in bad faith or dishonestly in placing a value, as of July 25, 1961 (the exchange date), on the plaintiffs' shares of Cole stock. Bad faith or fraud, of course, is not to be presumed.  See *Rankin* v. *New York, N. H. & H. R.R.* 338 Mass. 178, 186.   There is no indication of any advantage to Fund (as distinguished from its shareholders) in adopting the valuations of Cole shares shown by this record.   So far as appears, Fund's effort was solely to comply with the prospectus and to deal fairly with the plaintiffs in relation to Fund's other shareholders.

Precision cannot be expected in fixing either a value or a bid price for an unlisted "over-the-counter" security where several bid prices are reported at the same time. As one judge has pointed out, in respect of another stock (see *Fistel* v. *Christman,* 135 F. Supp. 830, 831 [S.D. N. Y.]), "The bid and offer quotation on the over-the-counter market, as shown by the records of the National Quotation Bureau, did not reflect actual transactions but at best were in the nature of 'feelers,' and . . . were . . . few in number." The nature of the National quotations has been recognized. See Loss, Securities Regulation (2d ed.), 1277–1283 ("The quotations . . . are not transaction prices. Probably they do not even amount to bids . . . which can be accepted by other dealers without further negotiation."). See also Report of Special Study of Securities Markets of the Securities and Exchange Commission, 88th Cong. 1st Sess. House Doc. No. 95, Part 2, pp. 541, 552, 569–576, 590, 595, 598, 604, 624–630, 635–637, 653, 677, 682, 707–709; Burns, Over-the-Counter Market Quotations, 52 Cornell L. Q. 262 (at pp. 268–269, "A quotation, if bona fide and genuine, is at best an indication of interest by a broker-dealer in buying . . . or selling securities, at the time of submission, at a given price if a price is quoted," and at p. 269, "One cannot tell whether a broker-dealer's two-way quotations reflect a continuous market of depth or permanence").

The plaintiffs contend that the bank should have taken at least the highest bid quoted for July 24, 1961. In this they rely on Rules 70 and 71 of the New York Stock Exchange to the effect that the highest bid and lowest offer "shall have precedence" in all cases. See C.C.H. N.Y. Stock Exchange Guide, pars. 2070, 2071. Even if we were to take judicial notice of these rules (cf. *White* v. *Universal Underwriters Ins. Co.* 347 Mass. 367, 373), they could hardly be given controlling weight with reference to the "over-the-counter" market, which differs (as the authorities already cited indicate) from the organized exchange markets. The bank was not required to give them such weight.

Doubtless, a seller of Cole stock on July 24, 1961, would have tried to obtain the highest bid or better, but whether

there would have been a market at that price for Saphier's 5,385 shares and Shore's 4,506 shares may be doubtful. The fact remains that the "last quoted bid price" was made up of several varying bids, and some method of taking account of the one-half point range of quoted bids might more accurately guide determination of the "last quoted bid price . . . known" to the bank than merely taking the highest bid. We cannot say that the bank erred, as matter of law, in viewing the quotations as a group as constituting the last quoted bid price, or that selecting the median bid as representative of the group was improper.

2. The plaintiffs also contend that the bank as custodian itself (by its conduct in redeeming Fund shares with Cole stock, fn. 7) interpreted the valuation provisions of the prospectus as calling for the high "pink sheet" quotation on each valuation date. The bank's practice in redemptions, although largely consistent with this contention, was not completely uniform. All the redemptions mentioned in the record, of course, took place about two years after the initial valuation as of July 24, 1961, and after the plaintiffs had complained about the method then employed. The bank obtained a quotation for each redemption from the dealer-manager rather than directly from the "pink sheets" as in the original valuation. No single redemption involved more than 502 Cole shares (as compared with the 9,891 shares in the aggregate deposited by these plaintiffs in 1961) and direct resort to the "pink sheets" may not have been deemed necessary. The bank's conduct, after a lapse of time and in somewhat different circumstances, does not seem to us a binding interpretation of the prospectus by it.

3. The plaintiffs also contend that the burden was on Fund to prove that it complied with the contract and made payment for the Cole shares deposited. See *Springfield Natl. Bank* v. *Jeffers,* 266 Mass. 248, 252–253. See also *Pampegian* v. *Richmond,* 319 Mass. 216, 219. They rely in part on G. L. c. 106, § 2–305 (3), "When a price left to be fixed otherwise than by agreement of the parties fails to be

fixed through fault of one party the other may . . . himself fix a reasonable price.'' This section is inapplicable. The prospectus (fn. 5) provided the price would be ''the last quoted bid price . . . known to the person . . . making such determination.'' The cases stated reveal no failure to fix the price because of Fund's fault[9] or because of the bank's fault.

4. These cases depend upon the nature of the function given to the bank as escrow agent and custodian. As to listed securities, the bank obviously had only the ministerial duty of ascertaining ''the last quoted sale price'' or ''the last quoted bid price . . . on such Exchange,'' a matter of Exchange record. See fn. 5 (a). As to unlisted securities, the bank had a slightly wider function because ''over-the-counter'' bids may cover a range of prices.

Certainly, the crucial provision (fn. 5 [a] at point [C], ''that such valuations will be made by the Custodian'') does not entrust to the bank any such broad scope of decision as was given to directors in *New England Trust Co.* v. *Abbott,* 162 Mass. 148, 154, or to arbitrators in *Jordan Marsh Co.* v. *Beth Israel Hosp. Assn.* 331 Mass. 177, 186. The bank, however, was given a limited judgment in view of the range of ''over-the-counter'' quotations already described, although the bank's determination could be reviewed to see whether the bank had misconceived its lawful function, in effect committing error of law.[10]

Doubtless, in lieu of the ''median''[11] bid selected in 1961, the bank could have taken (a) the high bid, or (b) the mid-

---

[9] Fund itself and its directors are not shown to have acted in the matter at all until September 18, 1961, when the directors ''voted to approve, adopt and confirm the valuation of securities.''

[10] For example, the bank, we think, would have been wrong (a) in going outside the range of the ''pink sheet'' bid quotations, or (b) in acting without responsible consideration of the underlying prospectus objectives (see fn. 3 and related text) of making Fund's original distribution of shares with reasonable precision and of maintaining the relative interests of shareholders among themselves.

[11] The ''median'' on July 24, 1961, turned out to be the same as the low bid. On various other dates shown in the record (e.g. September 11, 1963, when there were two bids at 18½, two at 18⅜, and one at 18¼) the ''median'' would not have been either the high or low bid.

dle bid of 29¾, or (c) the average of all bids. Even if we were to regard some other possibility as somewhat more appropriate than the "median," we cannot say that choice of the "median" was unreasonable. It was not the function of the trial judge, nor is it our function, to make the choice for the bank.

5. Judgments for the defendants were properly ordered.

*Exceptions overruled.*