. DERMAN RUG CO. INC. vs. JACOB RUDERMAN & another[1]
(and a companion case[2]).

Middlesex.   May 11, 1976. — July 14, 1976.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Landlord and Tenant,* Repair, Extension, Notice, What premises let,
Heat. *Words,* "Use."

In an action by a tenant against a landlord to recover for water dam-
age to merchandise, evidence warranted findings that the tenant had
given written notice to the landlord of structural problems in the
building, that there were many leaks, and that the landlord failed
to make all necessary repairs. [439-440]
Under the terms of a lease which provided that a tenant could extend
the term of the lease by notice delivered at least thirty days prior
to the expiration of the original lease provided he was not in default,
the tenant lost his right to extend the lease by the fact that he was
in default as of the date by which notice of extension was required
even though he had cured the default prior to the expiration of the
original term. [440-443]
Under the terms of a lease which provided that the landlord was re-
sponsible to keep the foundations, the roof, floors, and walls of the
building in the same condition of structural soundness as on the date
of the lease and that the tenant was responsible to keep the premises
in as good order, repair, and condition as at the beginning of the
term, the landlord was responsible for repairs to a steam pipe em-
bedded in the floor of the building. [443-444]·
Under a lease which provided that the tenant would pay all fuel costs
of heating the leased premises and of heating the rest of the build-
ing provided that the use of the building remained the same as at
the beginning of the lease term, the tenant was liable for the cost
of heating a room which had been vacant at the beginning of the
term but was let shortly thereafter where the tenant knew or should
have known that the room was normally rented and that the land-
lord intended to continue to rent it in the future. [444-446]

CONTRACT OR TORT.   Writ in the Superior Court dated
April 3, 1973.

---

[1] Jeannette Ruderman.

[2] Jacob Ruderman & another *vs.* Derman Rug Co. Inc.

The action was heard by *Zarrow*, J.

SUMMARY PROCESS.   Writ in the Second District Court of Eastern Middlesex dated September 25, 1974.

The plaintiff appealed to the Superior Court.

TWO CIVIL ACTIONS commenced in the Superior Court on November 21, 1974, and January 16, 1975, respectively.

The cases were consolidated for trial with the action of summary process and were heard by *Zarrow*, J.

*Robert S. Wolfe* for Jacob Ruderman & another.

*Alexander P. Blimmel* for Derman Rug Co. Inc.

HALE, C.J.   These appeals have their origins in six in-dependent actions all arising out of the same lease and landlord-tenant relationship. Four actions were consoli-dated for trial. The two remaining actions were also tried together. The resulting appeals were consolidated for oral argument in this court. We discuss the detailed factual and procedural background of these appeals only to the extent required by this decision. Matters appealed but not argued are deemed waived. Mass.R.A.P. 16(a) (4), as amended February 24, 1975, 367 Mass. 921.

On August 12, 1971, the Rudermans (landlord) leased for a term beginning August 15, 1971, the first floor and the basement of a two-story building on Moody Street in Waltham to Blimmel Corporation (tenant).[3] During the tenancy there were many disputes between the landlord and the tenant. The controversies arose from water dam-age caused by a leaking roof and walls, from a ruptured steam pipe, from a problem concerning allocation of insur-ance premiums, from a sewer backup, from electrical wir-ing problems, from a failure to provide heat to second floor tenants, and from disagreements over increased fuel oil costs. For a number of reasons, the tenant made a number of unauthorized deductions from its monthly rental pay-

---

[3] The tenant also purchased the assets and goodwill of Derman Rug Co. Inc. which had previously been operated by the landlord on the premises. Blimmel Corporation shortly thereafter changed its name to Derman Rug Co. Inc. with the consent of the landlord.

ments.[4] These disputes gave rise to six actions. We discuss the four actions now before us on appeal.

### 1. *The Tenant's Claim for Water Damage*

In section 7(a) of the lease, the landlord covenanted to keep the foundations, the roof, and the floors and walls in the same condition of structural soundness as on August 12, 1971 (the date of the lease), excepting fire or other casualty and reasonable wear and tear. Section 7(a) also specified that the landlord should not be required to begin any work necessary under that section until ten days after written notice from the tenant. Also, in section 8(f) the tenant waived all claims against the landlord for personal or property damage except for negligence by the landlord or his agents.

On May 7, 1973, the tenant commenced an action seeking to recover for additional water damage to merchandise. Among other things, the tenant alleged that the landlord had failed to keep the foundations, roof, and floors and walls of the building in the same condition of structural soundness as on August 12, 1971.

Under § 7(a) written notice was a condition precedent to the landlord's obligations to make repairs to maintain the condition of the building. Documentary evidence was presented to demonstrate that such written notice was given on July 27, 1972, September 28, 1972, and May 1, 1973. However, the tenant made claims for damages arising as early as November, 1971.[5] The trial judge was free to believe the tenant's testimony that written notice was also sent to the landlord in the fall of 1971. There was suffi-

---

[4] In March, 1973, the landlord commenced an action to recover the rent allegedly improperly withheld by the tenant because of disputes concerning damage resulting from leaks, allocation of insurance premiums, a sewer backup, electrical wiring problems and certain fuel bills. On July 10, 1975, a judgment for $1,153.72 was ordered for the landlord. That matter is not before us on appeal.

[5] It has not been argued that any of the damage may have occurred prior to the expiration of any ten-day period specified by section 7(a).

cient evidence to support the conclusion that the condition precedent to the landlord's obligations had been fulfilled.

The trial judge ruled that the landlord was obliged to use reasonable care to keep the roof, exterior walls, and foundation in at least the same condition as they were or appeared to be at the time of the execution of the lease and that the landlord failed to discharge that obligation. Judgment was entered awarding the tenant $8,116.73 in damages. Since the evidence shows that there were many leaks and that the landlord failed to make all repairs recommended to him by the roofing repairman he had employed, we conclude that the trial judge's decision is warranted in fact and in law. We also conclude that there was sufficient evidence in the record to support the amount of the damages awarded.

## 2. *Extension of the Lease*

Section 2 of the lease provided that "[t]he term of this Lease shall be three (3) years beginning on August 15, 1971, and ending on *August 15*, 1974. Tenant may extend the Lease for an additional three (3) years upon the same terms and conditions as herein contained by notice to the Landlord delivered at least thirty (30) days prior to the expiration of the original Lease, provided that Tenant is not in default of any of its obligations under this Lease." (The record shows that the italicized language was handwritten into blank spaces in a typewritten lease.)

By letter of July 10, 1974, the tenant notified the landlord "of the renewal for an additional three year term of the lease . . .." On July 17, 1974, the landlord's lawyer sent the tenant notice that, the tenant having failed to extend, the premises should be vacated by August 15, 1974.[6] In the early fall of 1974, the landlord sought to evict the tenant, claiming that it had remained on the premises after the expiration of the term of the lease. A District Court

---

[6] The landlord concedes in its brief that it received the tenant's notice of renewal but apparently that notice was not received prior to the dispatch of the notice to vacate.

Derman Rug Co. Inc. *v.* Ruderman.

decided in favor of the tenant, and the landlord appealed to the Superior Court. On January 16, 1975, the tenant brought an action seeking a declaratory judgment that the lease had been duly extended. On July 10, 1975, after a consolidated trial, the judge ruled that the lease had been extended for an additional three years from August 15, 1974. Judgment was entered accordingly. A judgment was also entered for the tenant in the eviction case. The landlord appeals from both judgments.

A lease may contain express conditions precedent to the exercise of a right of renewal or extension. Thus, the right to renew or extend may be expressly conditioned upon compliance by the tenant with any or all covenants of the lease. *D. A. Schulte, Inc.* v. *Brockton Y.M.C.A.* 273 Mass. 335, 342 (1930). Schwartz, Lease Drafting in Massachusetts, § 5.20 (1961). See *Bickford* v. *Dillon,* 321 Mass. 82, 83 (1947). Here, the lease made the tenant's right to extend conditional on (1) the giving of notice thirty days prior to the expiration of the original term and (2) the tenant's not being in default. Where, as here, a tenant's right to extend the lease is expressly dependent upon its performance of covenants or conditions, breach or nonperformance will defeat the tenant's right to extend. *Squire* v. *Learned,* 196 Mass. 134, 136 (1907). *Saxeney* v. *Panis,* 239 Mass. 207, 209 (1921). If the tenant fails to give timely notice or is in default, its right to extend is defeated. Assuming timely notice in the present case (as the judge impliedly found), the question presented is whether the lease required that the tenant not be in default at the time of such notice or required only that the tenant not be in default at the time of the expiration of the original term of the lease.

As of the date by which notice of extension was required (July 15, 1971), the tenant was in default. However, after that date, but before the expiration of the original term of the lease, the tenant tendered payment of an amount sufficient to cure the default. The trial judge ruled that "[t]he tenant was not in default at the end of the original term of the lease and therefore it properly exercised the

option to extend the lease." We are of the opinion that the lease required that the tenant not be in default at the time of notice rather than at the expiration of the original term. Because the tenant was in default on July 15, 1971 (date of notice), it had lost its right to extend the lease. Therefore we conclude that the trial judge erred in ruling that the lease was extended.

An extension clause should be construed in light of the language used by the parties, employing established principles of construction as a guide. *Talbot* v. *Rednalloh*, 283 Mass. 225, 230 (1933). We find support for our conclusion from the language of the lease. First, the default proviso is appended to a sentence which specifies when notice must be given. Second, we think that the phrase "prior to the expiration of the original lease" bears no direct relationship to the default proviso. Instead, it is an integral part of a longer phrase ("thirty [30] days prior to the expiration of the original Lease") which was used as a means of expressing a particular date. When the clause was drafted the parties did not know exactly when the original term would begin or end. This is evidenced by the fact that "August 15" was later written into the appropriate blank spaces of the lease. Since the parties initially did not know when the original term would end, they used the phrase, "thirty (30) days prior to the expiration of the original Lease" as a formula to determine the date, then unknown, when notice would be required. Substituting July 15, 1974, for that phrase, we think it is clear that the tenant's default or lack thereof should be viewed as of that time (the time of notice) rather than as of the expiration of the original term. Third, it seems clear that it was the intention of the parties that the landlord know by July 15, 1971, whether the lease would be extended or whether he would have to seek new tenants.[7] In order to have such knowledge, the landlord would (1) have to have

---

[7] It should be noted that Section 13 of the lease gave the landlord the right to show the premises to prospective tenants thirty days prior to the expiration of the lease.

notice and (2) determine whether the tenant was then in default. Therefore, the condition precedent to the right to extend the lease must be viewed as pertaining to the time of the notice rather than to the time of the expiration of the original term.

### 3. *Heating Controversies*

On November 21, 1974, the landlord commenced an action seeking damages for failure by the tenant to heat the second floor of the building. The complaint alleged in count 1 that the tenant had failed to keep the heating system in good repair and failed to provide heat to the second floor tenants, thereby forcing the landlord to pay a portion of the heating costs. The judge made findings and entered judgment for the tenant.

### a. *Repair of heating pipe*

Section 8(a) of the lease provided: "Subject to the obligations of Landlord contained in Section 7, [*supra*, 439] Tenant shall at all times keep the Leased Premises clean and in as good order, repair and condition as the same were at the beginning of the Lease Term, damage by fire or other casualty and ordinary wear and tear excepted."

In October, 1974, a steam pipe embedded in the basement floor leaked, requiring the boiler to be shut down temporarily. The cost of repair ($556) was borne by the landlord, who argues that under section 8(a) of the lease such repairs were the responsibility of the tenant.

When a lease is executed for part of a building, pipes encased in walls or embedded in floors are normally within the landlord's exclusive control, and the landlord has the sole obligation to make repairs in the absence of an agreement to the contrary. See *Hilden* v. *Naylor*, 223 Mass. 290, 292-293 (1916); *Kendall* v. *Tashjian*, 258 Mass. 377, 378 (1927); *Devine* v. *Lyman*, 270 Mass. 246, 249 (1930). We do not think that the tenant's covenant under section 8(a) of the lease (*supra*) to make repairs to the leased premises was an agreement to the contrary. Whether the pipe was within the exclusive control of the landlord was

a question for the trier of fact. See *Priest* v. *Nichols,* 116 Mass. 401, 407 (1874); *MacDonald* v. *Adamian,* 294 Mass. 187, 191 (1936).

The trial judge did not award to the landlord the cost of repairing the pipe. Although the judge made no specific finding on the issue, it may be inferred from the fact that he entered a judgment for the tenant that he found that the pipe was within the control of the landlord. See *Berry* v. *Nardozzi,* 362 Mass. 145, 150 (1972). That implied finding of control is supported by section 7(a) of the lease, where the landlord covenanted to maintain, at his own expense, "the foundations, the roof and the structural soundness of the *floors* and walls" of the premises (emphasis supplied). Since the pipe was embedded in the basement floor, it was the responsibility of the landlord to maintain it.

Even assuming that the landlord's covenant to repair did not apply to the pipe, the tenant still would not have been liable for the repairs. Section 1 of the lease defined "Leased Premises" as "the first floor and basement of the building . . .." In a lease of a basement of a building, where the upper floors are let to other tenants, the land under the building is not part of the leased premises. See *Stockwell* v. *Hunter,* 11 Met. 448, 455-456 (1847); *Shawmut Bank* v. *Boston,* 118 Mass. 125, 128 (1875). As the pipe was embedded within the floor it was arguably not part of the leased premises. Compare *Lowell* v. *Strahan,* 145 Mass. 1, 8 (1887); *265 Tremont Street, Inc.* v. *Hamilburg,* 321 Mass. 353, 359 (1947).

Therefore, the tenant made no covenant to repair the pipe, and its repair was the responsibility of the landlord. We agree with the trial judge that the landlord should not have been awarded the cost of repairing the pipe.           .

### b. *Fuel costs*

Section 8(b) of the lease provided that "[t]enant covenants to pay when due all fuel (i.e., oil only) costs of heating the Leased Premises, all charges for electricity, telephone, water and gas used in the Leased Premises, and

any sewer use charge assessed against the Leased Premises. In addition, Tenant will pay when due all fuel (i.e., oil only) costs of heating the rest of the building, other than the Leased Premises, *provided, however, that the use of the rest of the building remains the same* as at the beginning of the Lease Term" (emphasis supplied).

The rear room of the second floor of the building had just been vacated when the parties entered into the lease. In June, 1972, the landlord leased that room to one Izen. In the following winter there was a substantial increase in the amount of fuel consumed. The tenant charged that Izen's occupancy constituted a change in use within the meaning of section 8(b) of the lease. After considerable controversy, the parties entered into an agreement on December 12, 1973, under which the tenant agreed to pay all fuel bills; however, pending a judicial determination of its right to do so, the tenant could deduct one third of the fuel costs from the monthly rental payments.

The trial judge construed the word "use" in section 8(b) of the lease as referring to the customary nature of the occupancy of the portions of the building not leased to the tenant regardless of whether those portions were in fact occupied at the time of the execution of the lease. He then concluded that "it was the tenant's obligation to pay for fuel oil costs to heat the rear suite on the second floor." The judge found that, at the time of trial, the tenant had already withheld $1,276.25 pursuant to the December 12, 1973, agreement. Implicitly the judge ruled that the tenant was obligated to pay that sum. The tenant knew or should have known that the back room of the second floor was normally rented and that the landlord intended to continue to rent it in the future. The rental to Izen was for a customary purpose, and the judge's construction of the word "use" was consistent with its definition, "habitual or customary practice." Webster's Third International Dictionary 2523 (1963). See *Commonwealth* v. *Patterson,* 138 Mass. 498, 500 (1885); *Tenement House Dept.* v. *McDevitt,* 215 N. Y. 160, 164-165 (1915); *Klapproth* v. *Turner,* 156 Conn. 276, 281 (1968).

This was not an instance of the landlord's renting the room for a purpose for which an inordinate amount of heat would be used, e.g., a sauna bath. Therefore, we agree with the trial judge's construction of the lease and with his ruling concerning the tenant's obligation to pay the cost of the fuel.

However, the sum found to be due was not mentioned in the order for judgment, nor was a judgment entered requiring the tenant to pay this sum. In fact judgment was ordered and entered for the tenant. We conclude that it was through inadvertence that the trial judge failed to order and enter judgment in the landlord's behalf in this action. Accordingly, the landlord should now be awarded the amount of rent improperly withheld.

### 4. *Attorney's Fees*

The judge made no award of attorney's fees, claimed by the landlord pursuant to section 19 of the lease.[8] The four-sentence argument on this point in the landlord's brief does not rise to the level of appellate argument and is of no assistance to us in extracting from the record those fees, if any, which could properly have been awarded under section 19. Without any such assistance we see no reason to disturb the judge's refusal to make an award of counsel fees.

### 5. *Disposition*

In no. 333724 (the water damage case) the judgment is affirmed. In no. 74-2721 (the heating dispute case) the judgment on count one is reversed, and judgment is to be entered for the plaintiff for the cost of fuel withheld

---

[8] Section 19 read: "Landlord's Right to Cure Defaults. At any time and upon fourteen (14) days' written notice, Landlord may, but need not, cure any failure by Tenant to perform its obligations under this Lease. Whenever Landlord chooses to do so, all costs and expenses incurred by landlord in curing a default, including, without limitation, reasonable attorneys' fees together with interest on the amount of costs and expenses so incurred at the rate of eight percent (8%) per annum, shall be paid by the Tenant to Landlord on demand, and shall be recoverable as additional rent."

in the amount of $1,276.25. The judgment on count two is affirmed. In no. 74-2475 (the eviction case) the judgment is reversed, and judgment is to be entered for the plaintiff. In no. 75-278 (the declaratory judgment case) the judgment is reversed, and judgment is to be entered declaring that the lease was not properly extended.

*So ordered.*