Coven, J.
Judgment for possession in this summary process action was entered upon an agreed statement of facts for the lessor, Nicholas Family Restaurant, Inc. (“Nicholas”). The tenant, William Mitry (“Mitry’). hied this Dist/Mun. Cts. R. A. D. A, Rule 8A, expedited appeal.
A case submitted to a trial judge upon the parties’ agreed statement of facts is a case stated, and it is the duty of the trial judge to make a correct ruling upon the agreed facts. Western Mass. Theatres, Inc. v. Liberty Mut. Ins. Co., 354 Mass. 655, 657 (1968). On appeal,
[sjince the same record that the judge considered is before [the appellate court], all questions of law presented by the record are open for consideration unaffected by any rulings the judge may have made. Mahony v. Board of Assessors of Watertown, 362 Mass. 210, 211 (1972). ... [A]ll questions of law, fact or discretion are open for review on the record presented. Caissie v. Cambridge, 317 Mass. 346, 347 (1944).
Amidon v. Reid, 2000 Mass. App. Div. 61, 61-62. The job of the appellate court is to enter the correct judgment upon the record before it. Saphier v. Devonshire St. Fund, Inc., 352 Mass. 683, 684 (1967).
Nicholas and Mitry entered into a commercial lease drafted by Nicholas’ legal counsel and reviewed and modified by Mitry’s counsel. The lease was for a five-year term commencing January 20, 1999 and ending on January 19, 2004. SECTION FIVE of the lease granted Mitry “the right to extend” the lease for an additional five-year period provided that (1) Mitry was not in default of any term or condition of th[e] lease,” and (2) Mitry provided Nicholas with notice that he “has exercised [the] option” at any time between January 20, 2003 and July 19, 2003. Further, under SECTION THREE and ARTICLE FIFTEEN[1] of the lease, respectively, Mitry obligated himself to pay “a rent of $1,450.00 per month ... plus 45% of [Nicholas’] cost of snow removal” from the leased property and to “promptly pay for” water and sewer charges assessed for the premises.
As to the snow removal charges, Nicholas sent an invoice to Mitry for payment of Mitry’s share of the snow removal costs in 2001. Mitry asked to see the actual bills from the snow removal company and Nicholas provided copies. For the 2001-2002 and the 2002-2003 seasons, Nicholas sent monthly statements of Mitry’s share of the snow removal costs. Mitry tendered payment of those costs *54 sometime in May of 2003, but prior to the twenty-eighth day of that month.[2] The payment included an 18% interest charge.[3]
As to the water and sewer charges, Nicholas gave any bills it received to Mitry for payment. Mitry failed to pay a bill issued on October 28,2002 in the amount of $134.16 which was due on or before December 2, 2002.[4] The $134.16 was then added to Nicholas’ tax bill through a special assessment.[5] While that assessment constituted a “lien” against Nicholas’ property, it was not a lien that could have resulted in the taking of the property by the municipality. Nicholas paid these water and sewer charges in equal installments as part of its January 23, 2003 and May 1, 2003 payments of its tax bills. Upon further demand by Nicholas, Mitry made payment of the water and sewer charges to Nicholas during the first week of May, 2003. Mitry explained that he had attempted to make payment directly to the municipality after the bill due date, but was told that he could not do so because the water and sewer charges had by then been incorporated into Nicholas’ tax bill.
The parties stipulated that Mitry gave notice of his intention to exercise the lease extension option “on or about March 21, 2003,” a point in time when his snow removal costs and water and sewer charges remained unpaid. On May 28, 2003, Nicholas rejected “Mitry’s purported exercise... due to Mitry’s repeated and continuous breaches” of the lease. A similar notice of rejection was issued by Nicholas on June 23, 2003. Mitry was not in default on the date of either of the notices of rejection because he had paid both the snow removal costs and water and sewer charges prior to May 28,2003, the date of the first rejection. Mitry never sent a second notice of his intention to renew after he made the payments and was no longer in default.
1. Mitry’s initial argument is that the lease is ambiguous as to whether the exercise of the option is effective where the party is in default on the day notice of extension is given but the default is cured before the expiration of the option period, and that such ambiguity in the lease should be construed against Nicholas. Conversely, Nicholas contends that the controlling date for determining whether the exercise of the extension option was effective is the date of notice, and that Mitry could not have validly exercised the option to extend because he was in default on the day of his notice. Nicholas further argues that even if a lease ambiguity exists, it cannot be construed against Nicholas because both parties were in an equal position in bargaining for, and setting the provisions of, the lease.
“‘[A]n ambiguity is not created'simply because a controversy exists between parties, each favoring an interpretation contrary to the other’s.’” Suffolk Constr. Co. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999), quoting Jefferson Ins. Co. v. Holyoke, 23 Mass. App. Ct. 472, 475 (1987). We discern no ambiguity in this case. Mitry “ha[dj the right to extend” the lease for an additional five year period provided that (1) Mitry was “not in default of any term of condition of th[e] lease” and (2) Mitry provided Nicholas with notice that he “has exercised [the] opinion” at some point between January 20 and July 19,2003. The verb “has exercised” is in the present perfect tense. It denotes that Mitry had already exercised his option to *55 renew at the time he made that exercise known to Nicholas through the required notice. The “right to” and “has exercised” language, properly construed together, indicate that the option had to be exercised and the notice then given at a time when there was a right to exercise the option. When Mitry was in default, there existed no right to exercise the option. Notice of a valid option exercise had to be given when Mitry was not in default.
Mitry’s reliance on Derman Rug Co. v. Ruderman, 4 Mass. App. Ct. 437 (1976) for a contrary result is misplaced. In that case, the tenant was in default at the expiration of the election period, but cured the default prior to lease expiration. The issue was “whether the lease required that the tenant not be in default at the time of... notice or required only that the tenant not be in default at the time of the expiration of the original term of the lease.” Id. at 441. It is correct that in Derman Rug, the Appeals Court looked to the last day of the period in which the tenant had a right to extend its lease to determine if the tenant was then in default. That date was used, however, because the record indicated only that the tenant had given timely notice of its option exercise on July 10, 1974 before the July 15, 1974 expiration of the option period, and that the landlord received the tenant’s notice sometime after its July 17, 1974 rejection of the tenanfs extension attempt. The record did not indicate the exact date upon which the landlord received the tenanfs notice. The Appeals Court fixed the date of notice as July 15,1974, a date on which the tenant was indisputably in default. The agreed statement of the facts in this case renders it clear that Mitry was in default when he gave notice of his election to extend, and that the purported election occurred well before the cure of any default.
2. The remaining issue is whether the breach had to be material to prevent Mitry from exercising his unilateral right to extend the lease. As stated in Derman Rug Co., “the right to renew or extend may be expressly conditioned upon compliance by the tenant with any or all covenants of the lease [emphasis supplied].” Id. at 441, citing D.A. Schulte, Inc. v. Brockton Y.M.C.A., 273 Mass. 335, 342 (1930); Bickford v. Dillon, 321 Mass. 82, 83 (1947) and SCHWARTZ, LEASE DRAFTING IN MASSACHUSETTS, §5.20 (1961). We need not decide whether, in the context of modern commercial leases, boilerplate language providing that “any” lease breach would result in the forfeiture of a tenanfs option to extend would be enforceable; or whether a breach must be something which deprives the landlord of a “significant inducement to the making of lease.” Restatement (Second) of Property: Landlord & Tenant §13.1 (1977) .[6] It is clear in this case that Mitry’s breach of his obligation to pay snow removal costs constituted a material breach of the parties’ lease.
Snow removal costs were part of the consideration of rent Nicholas provided monthly billing statements over a two-year period, and Mitry failed to make payment even after he requested and obtained documentation of the charges from Nicholas. While Mitry argues in his brief that he had continuing concerns about the actual costs of the snow removal, the parties’ agreed statement contains no such fact. While there exists some evidence of Mitry’s early concern about the charges, that evidence supports an inference that the charges in question were more than nominal.
With respect to the water and sewer charges, the parties have stipulated that Mitry did attempt to make a late payment but was prevented from doing so by the *56 municipality after the charges had been added to Nicholas’ January, 2003 tax bill. There is no information as to when that tax bill was delivered by Nicholas to Mitry. There is also no evidence from which an inference can be drawn that Mitry was given sufficient time within which to “promptly pay” the water and sewer bill by its due date. In any event, the issue of the water and sewer charges is not dis-positive given our determination that Mitry’s failure to pay the snow removal costs was a material breach of the lease.
Judgment affirmed.
So ordered.

 While maintaining sequential numerical order, the captions of the lease provisions change from “Section” to “Article” following SECTION TWELVE.

 The record does not indicate the amount of the payment tendered by Mitry.

 Pursuant to Section 4(c) of ARTICLE FOURTEEN of the lease, if Nicholas paid any of Mitry’s obligations, Nicholas was entitled to reimbursement plus 15%.

 The record is silent as to when Nicholas gave this particular water and sewer bill to Mitry.

 Pursuant to Sections 4(a) and 4(c) of ARTICLE FOURTEEN of the lease, if Mitry defaulted on “the payment of any installment of rent or other sum ... specified” and the default continued for ten days, Nicholas had the right to re-enter the premises, declare the lease ended and remove Mitry’s effects. Nicholas retained the same rights with regard to defaults on other obligations provided that the default was not corrected within thirty days after written notice of default was given to Mitry.

 It is questionable whether the statement in Derman Rug Co. expresses the realities of modern commercial leases. In this case, for example, ARTICLE FIFTEEN of the parties’ lease required Mitry to “keep the premises and grounds... free from all litter and trash.” It would seem inequitable that Mitry could have been denied his right to extend the lease if on the day of his notice of the election — assuming it was given on the last available date with no opportunity to cure — Nicholas rejected the extension because there were one or two pieces of litter on the premises.