TRAVELERS INSURANCE
COMPANY, Plaintiff,

v.

WALTHAM INDUSTRIAL LABORATO-RIES CORP., Memory Lane, Inc., Melvin Rosenfeld and Phyllis Rosenfeld, Defendants.

Civ. A. No. 87–0760–MA.

United States District Court,
D. Massachusetts.

Sept. 26, 1988.

David O. Brink, Owen Gallagher, John P. Graceffa, Gallagher & Gallagher, P.C., Cassandra Warshowsky, Steven L. Schreckinger, Tamara S. Wolfson, Palmer & Dodge, Boston, Mass., for plaintiff.

Anton T. Moehrke, Thomas A. Mackie, Kim Maree Johannessen, Wright & Moehrke, P.C., Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is presently before this Court on cross motions for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure.[1] At issue here is the interpretation of a contract of insurance between Travelers Insurance Company ("Travelers") and Waltham Industrial Laboratories ("WIL") and Memory Lane, Inc. Melvin Rosenfeld was the founder and chief executive officer of WIL, a company involved in the electroplating business. It was located at 225 Crescent Street, Waltham, on a parcel of land leased from First Republic Corporation ("First Republic"). Also located at this site was Memory Lane, Incorporated ("Memory Lane"), a business involved in the preservation of baby shoes, which was solely owned and operated by Melvin Rosenfeld's wife, Phyllis.

In 1984, an action was filed against the present defendants by their landlord, First Republic, seeking redress for alleged damage to the leased premises arising from "the unlawful release by certain of the defendants of hazardous materials into the environment." On January 30, 1987, First Republic filed an amended complaint. In 1985, the Massachusetts Water Resources Authority ("MWRA"), the Commonwealth of Massachusetts, and the Attorney General also filed suit against WIL, Melvin Rosenfeld and First Republic, for alleged unlawful discharges of pollutants into the metropolitan sewer system, water and ground of the Commonwealth (hereinafter, the "MWRA suit"). Both of these suits were terminated, with WIL paying to each of the plaintiffs a substantial amount of money.

Travelers sued in this Court on March 27, 1987, for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking a ruling that under the terms of its agreement with WIL, it had no duty to defend against the two suits mentioned above, nor had it a duty to indemnify WIL for the money expended in terminating those suits. The defendants answered, and filed counterclaims against Travelers on April 29, 1987. In their counterclaim, the defendants alleged that Travelers agreed, albeit originally under a reservation of rights, to undertake a defense in the *MWRA* suit, and later made a $10,000 payment toward its defense obligations. After making two additional, smaller payments, however, Travelers refused to make further contributions, asserting that it had no duty to defend in the suit, which had by this time been consolidated with the *First Republic* action, in which Travelers had previously refused to participate in the defense. The defendants seek a declaratory judgment pursuant to Chapter 231A of the Massachusetts General Laws that Travelers "[h]aving acknowledged and assumed its obligation to defend the defendants ... may not cease providing such defense until a final adjudication of its duty to defend and indemnify[ ] the defendants" has been made. The defendants also seek a preliminary injunction to require compliance with the defense agreement, and damages based on statutory and breach of contract grounds.

On March 15, 1988, Travelers moved for partial summary judgment on the issue of whether it had a duty to indemnify the defendants for either of the settlements reached with regard to the underlying actions. Travelers advanced four grounds in its motion in support of its argument that it had no duty to indemnify—three based on provisions of the policy itself and one based on a Massachusetts statute prohibiting insurance companies from insuring persons "against legal liability for causing injury, other than bodily injury, by his deliberate or intentional crime or wrongdoing." Mass.Gen.Laws Ann. c. 175, § 47(6)(b) (West 1987). Also on that date, the defendants moved for summary judgment on its counterclaims. Later, on April 15, Travelers filed a cross-motion for summary judgment on its petition for declaratory judgment on the issue of Travelers' duty to defend the defendants in the two underlying suits, and on the defendants' consumer protection claim brought pursuant to chapter 93A of the Massachusetts General

---

1. Travelers also filed a motion to strike the Defendants' Opposition to Travelers' Supplemental Statement of Material Facts Not in Dispute and its attached Supplemental Exhibits. That motion was denied on June 17, 1988.

Laws. Each side has opposed the other's motion.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). This Court is thus required to examine the relevant facts in the light most favorable to the non-movant, *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), indulging that party all appropriate inferences, *Voutour v. Vitale*, 761 F.2d 812, 817 (1st Cir.1985), *cert. denied sub. nom. Saugus v. Voutour*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986), and determine if there exists a genuine issue of material fact that must be reserved for the factfinder, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party"). This standard requires a non-movant to offer "concrete evidence from which a reasonable juror could return a verdict in his favor," *id.* at 256, 106 S.Ct. at 2514; "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511.

## I.

Briefly stated, the relevant facts are as follows.

In 1959, Melvin Rosenfeld, a chemical engineer, established WIL, and began operating an electroplating business in buildings and on land leased from First Republic. Initially, WIL occupied Building 16 and part of Building 17, later expanding into the rest of Building 17 as well as Buildings 18 and 19.

Several types of corrosive chemicals are used in the electroplating process. It is the effect and the disposal of these materials that is at issue in this litigation. First Republic contends that these chemicals caused serious damage to the metal surfaces in the buildings leased to the defendants as well as other damages; indeed, as early as 1967, First Republic expressed this concern to WIL. The Commonwealth asserts that these chemicals were the source of damage to the environment.

Travelers recites a long history of warnings and complaints issued to WIL from various governmental bodies regarding WIL's disposal of wastes. In 1971, the Director of the Water Resources Commission informed Rosenfeld and the Superintendent of the Waltham Public Works Department that WIL's daily discharge of 35,-500 gallons of untreated electroplating wastes into the sewer would damage the sewer lines. Later in 1971, the Massachusetts Division of Water Pollution Control notified WIL that some of its electroplating wastes were running into the Charles River, and ordered WIL to abate this pollution.

In September of 1973, the Metropolitan District Commission ("MDC") notified WIL of several violations of MDC regulations governing discharges of chemicals and toxic heavy metals into the sewer system. For instance, the MDC alleged in its report that WIL had made illegal cross-connections between its rinse and plating tanks and the public water supply without proper safety devices, that seepage from plating and rinse tanks was drained through holes in the floor of the building into the basement, that illegal discharges were being made into the sewer system, including the discharge of sludge, and that these discharges were wearing away the sewer pipe and pumping equipment at the facility. As a result of its investigation, the MDC recommended that the city of Waltham disconnect WIL's sewer line to prevent further pollution. On October 2, 1973, Rosenfeld acknowledged that WIL was discharging 35,500 gallons of untreated waste into the sewers daily, and that these discharges contained such contaminants as cyanide, acids, nickel, cadmium and zinc. He indicated, however, that he would undertake measures to correct this problem, and would hire a company to dispose of toxic

heavy metals generated by the plant. Rosenfeld eventually hired a consultant, who indicated that a system of pretreatment was planned for WIL, and that the sludge generated would be disposed of by a private firm, the name of which would be submitted to the MDC. No name was ever submitted.

In 1974, WIL submitted to MDC a "Preliminary Engineering Report for Industrial Waste Treatment" prepared by a second consultant describing a comprehensive pretreatment plan that Mr. Rosenfeld planned on implementing. On September 30, 1974, Rosenfeld wrote to the Environmental Protection Agency, informing them that although he felt implementation of the recommendations of the second consultant were "an absolute necessity," he needed financial and technical assistance to achieve it. The system was never installed. WIL asserts, however, that a device designed to moderate the pH of discharges from the plant was installed after 1977, but admitted that it did not always function correctly, and was not used between 1959 and 1977.

In March of 1984, WIL ceased operations. An inspection of the premises in June, 1985 revealed sludge in the crawl spaces beneath two of the buildings leased by WIL, Buildings 18 and 19.

On November 29, 1984, First Republic filed suit in state superior court seeking declaratory and injunctive relief arising out of the alleged illegal pollution caused by the defendants that had resulted in damage to the buildings owned by First Republic. On January 30, 1987, First Republic amended its complaint, seeking recompense for the costs incurred in repairing other damage caused by the release of hazardous chemicals by the defendants at the site. On August 12, 1985, the Massachusetts Water Resources Authority ("MWRA"), the Commonwealth of Massachusetts and the Attorney General of the Commonwealth filed suit against WIL, Melvin Rosenfeld and First Republic, seeking injunctive relief and civil penalties for the alleged unlawful discharge of pollutants into the metropolitan sewer system, and for the recovery of clean up costs necessitated by that pollution. It alleged liability for violations beginning in September, 1973 of regulations governing discharges into the sewers of the metropolitan region.

Since an understanding of these two suits is of central importance in resolving the issues presented by Travelers' action and the motions advanced by the defendants, it is necessary to examine them in some detail.

In its amended complaint, First Republic described its suit as "an action for declaratory and injunctive relief resulting from the unlawful release by certain of the defendants of hazardous materials into the environment and to recover the costs and expenses of the taking of responsive and curative action by the plaintiff, necessitated by the release of such hazardous materials." First Republic further alleged that in April, 1984, it was informed by the Attorney General that the Commonwealth intended to institute legal action against First Republic, WIL and Melvin Rosenfeld seeking injunctive relief and civil penalties for alleged illegal discharges of hazardous materials into the metropolitan sewer system and for clean-up costs arising from the release of those wastes. First Republic received a draft of this complaint from the Commonwealth, and informed WIL and Melvin Rosenfeld of the alleged violations, and that they had violated the terms of its lease with First Republic.

First Republic further alleged that after it had made WIL and Melvin Rosenfeld aware of this development, Rosenfeld and his wife Phyllis organized Memory Lane as a corporation on August 8, 1984, and transferred assets of WIL to Memory Lane "for nominal or no consideration." First Republic contended that Memory Lane and Phyllis Rosenfeld continued the electroplating operations of WIL at the site despite a notice to quit issued by First Republic. First Republic also asserted that another business at the site, Waltham Precision Instruments, had proposed to acquire the special coating process business, assets, supplies and equipment owned by WIL.

First Republic organized its complaint into five counts. In the first, First Republic alleged that the defendants had allowed hazardous materials to be released at the site in violation of state statutory and regulatory restrictions, and that Melvin and Phyllis Rosenfeld and WIL are jointly and severally liable for the costs incurred by First Republic in correcting these conditions as required of First Republic as owner of the site under the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, chapter 21E of the Massachusetts General Laws. Furthermore, First Republic contended that as a result of the illegal releases, the buildings leased to the defendants suffered damage, in violation of the terms in the lease requiring that the defendants maintain the premises in as good condition as existed at the commencement of the tenancy. Under this count, First Republic requested a temporary restraining order and preliminary injunction against any further transfer of WIL assets not in the ordinary course of business, and a declaratory judgment that the defendants, and not First Republic, were legally responsible for allowing the release of hazardous materials at the site, and that First Republic is thus entitled to reimbursement of clean up costs from WIL. In count two, First Republic alleged that the Rosenfelds fraudulently transferred assets of WIL to Memory Lane to prevent First Republic from recovering the clean-up costs it expended at the site. It also contended that Memory Lane was preparing to sell the assets it had obtained from WIL to Waltham Precision Instruments, and that the money received would be put out of the reach of First Republic. In count three, First Republic alleged that the defendants negligently permitted the release of hazardous materials at the site, and were jointly and severally liable to First Republic for clean up costs expended, as well as for lost rent, and requested judgment against the Rosenfelds individually and WIL, jointly and severally, for these losses. Count four of the complaint asserted that the defendants negligently maintained a nuisance at the site by permitting the release of hazardous materials, for which they are alleged to be jointly and severally liable. Plaintiff in this count demanded judgment for damages for containing, assessing and removing the hazardous waste. In count five, the defendants were charged with having intentionally created a nuisance, for which the plaintiff again demanded judgment for damages for rectifying the condition. In the last section of the complaint, First Republic made several general demands for declaratory and injunctive relief, as well as a request for attorneys fees, costs and interest incurred in bringing the action.[2]

In its complaint against WIL, Melvin Rosenfeld, and First Republic, the MWRA described its suit as "an action for injunctive relief and civil penalties relating to unlawful discharges of waste, toxic chemicals and heavy metals to the metropolitan sewer system, and recovery of clean-up costs resulting from the release of hazardous wastes."[3] The MWRA alleged that WIL failed to comply with orders issued by the Metropolitan District Commission ("MDC"), MWRA's predecessor, to install and operate pretreatment and pH neutralization equipment, and failed to submit monitoring data as required by the MDC. Furthermore, MWRA asserted that an inspection conducted in January, 1981, demonstrated that the pH neutralization equipment that was emplaced was not operating and apparently had not operated since November, 1977, and that contaminated sludge was being produced by the facility and discharged into MDC sewers. Despite its request for analyses of treated waste and despite Rosenfeld's assurances that he

2. First Republic does not include in its requests for relief in this last section any request for monetary relief. Nevertheless, it does include such demands in the more particularized requests for relief within several of the individual counts. I thus construe the complaint as one seeking monetary relief as well as injunctive and declaratory relief for the alleged illegal disposal of hazardous waste at the site.

3. As will be discussed below, the MWRA complaint also included a demand for monetary damages for injury to the natural resources of the Commonwealth.

would comply, no analyses were submitted. MWRA further alleged that in early 1981, Rosenfeld applied for a discharge permit as required under Massachusetts law. The permit, which was granted in April, 1981, and expired in December, 1983, required pretreatment and pH modification of wastes and that WIL prepare daily effluent analyses. It also established a schedule to be followed in order to bring the facility into full compliance with MDC regulations. MWRA alleged, however, that WIL did not submit discharge reports or progress reports, nor did it achieve compliance with MWRA rules and regulations. Subsequent inspections revealed continuing violations. For instance, MWRA alleged that holes in the floor of the facility allowed untreated waste to flow directly into the sewer, that pipes and trenches and other conveyances were used by the defendants to intentionally or negligently discharge untreated waste and sludge directly into the sewer system and waters of the Commonwealth, and that the defendants intentionally or negligently allowed hazardous wastes and other chemicals to seep through the walls and floors of the facility into the ground and groundwater and eventually into the Charles River.

In the first of the seven counts of the complaint, the MWRA sought redress for violations of chapters 92 of the Massachusetts General Laws and MWRA regulations for discharging untreated or inadequately treated effluent into the MWRA sewerage system, failing to supply the MWRA with monitoring information required under orders issued by the MDC, failing to submit discharge and progress reports, failing to comply with the discharge permit issued by the MDC, and failing to maintain its pretreatment system continuously and effectively. Count two alleged that the defendants discharged pollutants into or proximate to the groundwater of the Commonwealth without a permit in violation of the Clean Water Act, chapter 21 §§ 42 and 27(14) of the Massachusetts General Laws. In count three, the MWRA alleged that Melvin Rosenfeld and WIL had disposed of hazardous waste in a manner dangerous to the environment without a license from the Department of Environmental Quality Engineering, in violation of the Massachusetts Hazardous Waste Act, chapter 21C of the Massachusetts General Laws, and regulations promulgated thereunder. Count four alleged violations of the Massachusetts Oil and Hazardous Materials Act, chapter 21E, and asserted that the defendants were jointly and severally liable for triple the costs that the Commonwealth anticipated expending in the clean-up. These costs were estimated at $500,000 and were for the assessment, containment and removal of hazardous waste from the building and ground at the site, and for the injury to the natural resources of the Commonwealth. The MWRA alleged in count five that the defendants' release of hazardous material constituted a public nuisance in violation of the state constitution. Count six asserted that the operation of WIL was an abnormally hazardous activity because of the potential for polluting the environment, and that the defendants were thus strictly liable for contamination of the ground and water. Lastly, count seven charged that Rosenfeld and WIL knew or should have known that their handling of hazardous waste would contaminate the environment, and that they intentionally or negligently continued to operate the facility in a manner resulting in such contamination. In its requests for relief, the MWRA sought preliminary and permanent injunctive relief, civil penalties against WIL and Melvin Rosenfeld, money damages against each defendant for injury to the natural resources of the Commonwealth, and three times the expenses and costs the Commonwealth expected to spend if it conducted the clean-up itself.

On November 8, 1987, First Republic settled its action against WIL for $242,500. On the same day, WIL and Melvin Rosenfeld entered into an Agreement for Judgment with the MWRA, the Commonwealth and the Attorney General, under which WIL and Melvin Rosenfeld paid a civil penalty of $27,500.

At issue here is whether any of the expenditures made by WIL in terminating the two suits brought against it are recoverable from its insurer, Travelers.

Travelers issued insurance policies to WIL covering the period from December, 1979, to December 1, 1984, cancelled effective October 1, 1984, and issued a policy to WIL and Memory Lane for the period between July, 1984 and July, 1985. Five of the provisions of the contract of insurance with WIL are of significance here.

The first two outline Travelers' responsibilities to the insured. Under the contract, Travelers is obligated to "pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies," caused by an "occurrence" as that term is defined in the policies. A second provision establishes Travelers' duty to defend its insured against law suits in appropriate cases. It reads:

> [T]he Company [Travelers] shall have the right and duty to defend any suit against the *Insured* seeking damages on account of such *bodily injury* or *property damage,* even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient ...

(emphasis in original).

WIL contends that Travelers breached this provision in its handling of the matters at issue here.

The other three provisions of significance in this action are advanced by Travelers as support for its argument that it owed WIL no duty to either defend or indemnify them from suit. The first of these is what Travelers refers to as the "pollution exclusion" provision. It states that the insurance coverage provided does not apply

> to *bodily injury* or *property damage* arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant

(i) if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any *Insured* or any person or organization for whose acts or omissions any *Insured* is liable, or (ii) resulting from or contributed to by any condition in violation of or non-compliance with any governmental rule, regulation or law applicable thereto.

(emphasis in original).[4]

The next provision of importance in this suit is the definition of "occurrence" in the contract. Under the agreement, coverage is provided only where damage or injury results from an "occurrence," defined as

> an accident, including continuous or repeated exposure to conditions, which results in *bodily injury* or *property* damage neither expected nor intended from the standpoint of the *Insured.*

(emphasis in original).

The last portion of the contract of significance in this matter excludes coverage for damage to leased property. It reads

> This insurance does not apply ... to *property damage* to:
>
> (1) property owned or occupied by or rented to the *Insured;*
>
> (2) property used by the *Insured,* or
>
> (3) property in the care, custody or control of the *Insured* or as to which the *Insured* is for any purpose exercising physical control.

(emphasis in original).

Travelers contends, *inter alia,* that each of these exclusions by themselves bars coverage for the claims advanced by WIL with regard to the settlement with First Republic. Additionally, Travelers asserts that the civil penalties paid by WIL in settling the suit brought by the Commonwealth are outside the coverage of the policy, as such payments do not constitute reimbursable damages. Travelers also asserts that the events giving rise to the underlying suits

---

**4.** It is unclear whether this last subsection concerned with violations of governmental rules, regulations or laws is part of the insurance contracts at issue. Travelers does not argue that it applies here, nor even mentions it in its pleadings. Although this subsection would clearly be of benefit to Travelers in making its case, I do not find that it is necessary to its case, and thus find no need to resolve the issue of whether it is part of the insurance contracts involved here.

occurred in whole or in part outside of the policy period, that the defendants failed to comply with the policies in that they did not give timely notice of the occurrences underlying the two suits, and that the defendants "failed to disclose, concealed or misrepresented the nature of state and local inquiries into the pollution hazard presented by Waltham Industrial's activities" upon which Travelers relied, or perpetrated a fraud along these lines, thus relieving Travelers of its responsibility under the policies.

## II.

### A. *The Duty to Defend*

The first issue to be considered here is whether Travelers owed any of the defendants a duty to defend them from the lawsuits underlying this action.

The defendants advance two rationales in support of their claim that Travelers owed them a duty to defend them in the underlying suits. First, they contend that such a duty arose from the terms of the policies when the suits were filed. Secondly, they maintain that Travelers "expressly agreed to defend them or made statements which caused them to reasonably believe that Travelers had so agreed" with regard to the *MWRA* suit, a duty which carried over to the *First Republic* suit after the two were consolidated.

 As to the first claim, both parties appear to agree that an insurer owes a duty to defend where a complaint filed against an insured is " 'reasonably susceptible' of an interpretation" that it "state[s] . . . a claim covered by the policy terms." *Continental Casualty Co. v. Gilbane Building Co.*, 391 Mass. 143, 146, 461 N.E.2d 209 (1984), *quoting Sterilite Corp. v. Continental Casualty Co.*, 17 Mass. App.Ct. 316, 318, 458 N.E.2d 338 (1983), *rev. denied*, 391 Mass. 1102, 459 N.E.2d 826 (1984) (citations omitted). The task of this Court, then, is to compare the complaint with the terms of the policy to determine if the allegations state claims that could potentially fall under the coverage provided under the insurance contract with

Travelers. "Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." *Sterilite*, 17 Mass.App.Ct. at 318, 458 N.E.2d 338. An insured only has to show "a possibility that the liability claim falls within the insurance coverage." *Id.* at 319, 458 N.E.2d 338, *quoting Union Fire Insurance Co. v. Inhabitants of the Town of Topsham*, 441 A.2d 1012, 1015 (Me.1982). In determining whether there exists a duty to defend, an insurer must compare the policy with the complaint and must also consider "facts that are known or readily knowable by the insurer." *Desrosiers v. Royal Insurance Co. of America*, 393 Mass. 37, 40, 468 N.E.2d 625 (1984), *citing Terrio v. McDonough*, 16 Mass.App.Ct. 163, 167, 450 N.E.2d 190 (1983), *rev. denied*, 390 Mass. 1102, 453 N.E.2d 1231 (1983).

If the complaint is reasonably susceptible to an interpretation in which coverage is to be extended to the claims presented, the insurer can still assert his arguments that coverage is not so provided, and thus the duty to defend does not attach, under a procedure established in the *Sterilite* case. 17 Mass.App.Ct. at 323, 458 N.E.2d 338 ("When . . . the allegations of a third-party complaint find apparent lodgement in the effective coverage of the policy, the insurer is obligated to defend" unless he takes specific steps in court to avoid the duty). Although noting that "it is the claim which determines the insurer's duty to defend; and it is irrelevant that the insurer may get information from the insured, or anyone else, which indicates, or even demonstrates, that the injury is not in fact 'covered' ", 17 Mass.App.Ct. at 324 n. 17, 458 N.E.2d 338, *quoting Lee v. Aetna Casualty & Surety Co.*, 178 F.2d 750, 751 (2d Cir.1949), the Court in *Sterilite* went on to hold that an insurer may "get clear of the duty [to defend] from and after the time when it demonstrates with conclusive effect on the third party that as a matter of fact—as distinguished from the appearances of the

complaint and policy—the third party cannot establish a claim within the insurance." *Id.* at 323, 458 N.E.2d 338. The Court further held that this demonstration may be made in the context of the third-party suit or in a separate declaratory action. "What is not permitted is that an insurer shall escape its duty to defend the insured against liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact: the insurer there stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof." *Id.* at 324, 458 N.E.2d 338 (citation omitted).

■ The rule established in *Sterilite* is thus a simple one—where the complaint appears to state a claim within the policy, an insurer must either defend or sue. Thus, if either of the complaints are reasonably susceptible to interpretations falling under the terms of the policies, Travelers was liable to defend, and had to sue for a declaratory judgment to avoid this liability (since both of the underlying suits terminated without trial, Travelers was apparently not in a position of demonstrating its non-liability in the context of either of those actions).

■ It is worth noting that under Massachusetts law, an insurer found in default of its duty to defend is bound by the result of the action in which the insurer was bound to defend, *Crane Service & Equipment Corp. v. United States Fidelity & Guaranty Co.,* 22 Mass.App.Ct. 666, 670, 496 N.E.2d 833 (1986), *Miller v. United States Fidelity & Guaranty Co.,* 291 Mass. 445, 448–49, 197 N.E. 75 (1935), and is liable for counsel fees expended by the insured in defending the action on its own. *Shapiro v. Public Service Mutual Insurance Co.,* 19 Mass.App.Ct. 648, 653, 477 N.E.2d 146 (1985), *rev. denied,* 395 Mass. 1102, 1105, 480 N.E.2d 24 (1985).

I will first consider the merits of the claim that Travelers owed a duty to defend based on the terms of the policies, and then I will consider the argument that Travelers owed a duty based on its representations regarding the *MWRA* suit, particularly after both suits were consolidated.

### 1. The MWRA Suit

The MWRA complaint against WIL, Melvin Rosenfeld and First Republic is styled as "an action for injunctive relief and civil penalties . . . and recovery of clean up costs resulting from the release of hazardous wastes." Under the contract, Travelers is obligated to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies."

■ The first issue presented by the parties is whether or not the complaint filed in the *MWRA* suit is one seeking damages. Travelers argues that it only seeks clean-up costs, which do not constitute "property damage" under the insurance contract, citing cases in support. The defendants cite cases in support of the opposite proposition. I need not resolve this dispute. In paragraph eight of the prayer for relief, the MWRA asks this Court to "award *damages* against each defendants for injury to the natural resources of the Commonwealth" (emphasis added). Since I find that the government can sue for property damage when the natural resources of the state are harmed, *see Continental Insurance Companies v. Northeastern Pharmaceutical and Chemical Co.,* 811 F.2d 1180, 1187 (8th Cir.1987), *reh. en banc,* 842 F.2d 977 (1988) ("In sum, we agree with the position . . . that the improper release of toxic wastes may cause 'property damage' not only to the actual owner of the land, water, or air, but also to state and federal governments because of their 'interest independent of and behind the titles of its citizens in all the earth and air within [their] domain' ") (citation omitted) (insert in original), the complaint filed in the *MWRA* suit properly seeks damages. Thus, the Commonwealth's complaint implicated Travelers' duty to defend, since the policy included a pledge to provide a defense where damages were sought from the insured.

824

Travelers argues, however, that the pollution exclusion applies here; since the damages alleged by the MWRA resulted from negligent or intentional discharges of waste by the insured, these emissions must be seen as expected or intended by WIL, and thus not covered under the policy. In response, the defendants argue that the *MWRA* complaint, like the complaint in the *First Republic* suit, seeks damages for pollution to the crawl space under Buildings 18 and 19, two of the structures leased by WIL, and damage to the groundwater below.

I find the defendants' argument persuasive. Although their assertion that the underlying complainants are seeking recompense for pollution deposited in the crawl spaces is of greater force in the context of the *First Republic* suit, it has some force here as well. While the pleadings in the *MWRA* suit do not mention the crawl space, the complaint refers to violations of discharge regulations and of seepage from the floor and walls of the buildings into the sewer system, *ground* and *groundwater* at the site in violation of state regulations and statutes. The MWRA's complaint is thus focused on regulatory violations, and also on what the defendants contend is an accidental spillage of pollutants in the crawl space of two of the buildings.

Although it is the law that "[e]xclusions from [insurance] coverage are to be strictly construed," *Quincy Mutual Fire Insurance Co. v. Abernathy*, 17 Mass.App.Ct. 907, 908, 455 N.E.2d 644 (1983), *rev'd on other grounds*, 393 Mass. 81, 469 N.E.2d 797 (1984), I agree with Travelers and find that the exclusion applies in this matter. In its complaint, MWRA sought relief for intentional or negligent releases of pollutants into the environment. It seems clear on this record that the discharges were expected by Melvin Rosenfeld and WIL, and there is a basis for finding the discharges were intended. The complaint filed in the *MWRA* suit, as well as the record that was developed with regard to

that action, is replete with notices and warnings from various state bodies concerning the pollution caused by WIL, and the need to correct the problem. Rosenfeld himself recognized the importance—the "absolute necessity" as he put it—of emplacing some sort of environmental controls to treat the wastes produced by his plant, but failed to install any system except a generally dysfunctional pH neutralizing unit. The defendants thus cannot argue that the *discharges*, if not *intended*, were not *expected*. Cf. *Great Lakes Container Corp. v. National Union Fire Insurance Co.*, 727 F.2d 30, 33–34 (1st Cir. 1984) (where the Court found that property damage resulting from pollution that "has taken place as a concomitant of its regular business activity" was not covered under a policy that included a pollution exclusion provision barring recovery for pollution that was not sudden and accidental). Since the policy does not require a showing that the *result* of the discharges be unintended for coverage to be excluded under the pollution exclusion, it is sufficient here to recognize that the expected continual release of pollutants prevents WIL from claiming coverage from Travelers. Cf. *Quincy Mutual Fire Insurance*, 393 Mass. at 86, 469 N.E.2d 797 (where the court construed a policy where the result had to be intended for coverage to be denied, a situation not present under the facts presented here); *see Fireman's Fund Insurance Co. v. Ex-Cell-O-Corp.*, 662 F.Supp. 71, 75–6 (E.D. Mich.1987) (in construing a similar pollution exclusion clause denying coverage for all releases of pollutants except where such release was "sudden and accidental," the court found that "[a]pplication of the pollution exclusion depends exclusively upon the process by which pollutants entered the environment ... The decisive inquiry is not whether the policy holders anticipated property damage, or whether they regularly disposed of hazardous waste, but whether the pollutants entered the environment unexpectedly and unintentionally" [5]) (footnote omitted) (citation omitted).

**5.** In a footnote, the court in *Fireman's Fund* explained the relationship between the pollution

exclusion and the definition of occurrence, identical to that in this case: "Application if this

This conclusion, however, was apparently not clear on the face of the complaint. Indeed, Travelers did not act to relieve itself of its duty to defend until some two years after the filing of this suit. Travelers explained that although "the Commonwealth's complaint stated unequivocally ... that the complaint was solely 'an action for injunctive relief and civil penalties' and made specific reference to the defendants' violations and failure to comply with 'several' orders of the MDC during the period from September 1973 to June 1976, more than three years before the Travelers issued its first CGL policy to Waltham," Plaintiff Travelers Insurance Company's Supplemental Statement of Material Facts Not In Dispute, ¶ 124, and it thus "appeared to be sufficient grounds for disclaiming coverage of this action", *id.*, Travelers nevertheless undertook the defense under a reservation of rights while conducting an investigation of the allegations and waiting to see if the Commonwealth's allegations of willful and deliberate pollution and noncompliance could be substantiated.

■ I find that Travelers properly followed the procedure outlined in *Sterilite* in determining whether it should undertake the defense of this suit. Once Travelers completed its investigation of the MWRA's claim, it filed this declaratory action to avoid any continuing duty to defend. Prior to this filing, it had made significant contributions to defray the defendants' legal expenses, making a $10,000 lump payment and two smaller payments some five months after commencing this action. There is some dispute between the parties as to whether or not Travelers paid all of the money due the defendants in fully discharging its duty. I find that there is a genuine dispute concerning this point, and I thus make no ruling as to whether Travelers had completely fulfilled its duty prior to

filing this action. This dispute seems academic, however, since I find that Travelers has amply supported its argument that it owed no duty of defense to the defendants with regard to the *MWRA* suit. I thus find that, under the terms of the policy, Travelers owed no duty to defend Melvin Rosenfeld or WIL in the suit brought by the MWRA.

■ The defendants also allege that Travelers "expressly agreed" to defend them in this action, and that Travelers should thus be estopped from denying its liability not only for this action, but for the *First Republic* suit once it was consolidated with this one. My review of the record indicates that Travelers made no such unqualified promise to defend. Travelers argues that it did agree to pay for some of the legal fees incurred by WIL in the *MWRA* suit while it studied the situation to determine if the circumstances alleged "constitute an occurrence resulting in property damage during the policy periods covered by the Travelers," adding that until their own investigation was complete, Travelers reserved its rights to alter its decision. WIL asserts, however, that in a later letter, Travelers allegedly admitted their responsibility to provide a defense in both cases after they were consolidated. Although it does appear that Travelers was assuming responsibility for the defense costs after consolidation, and was involving itself in the defense of this action (by taking such actions as attending meetings of insurers of the defendants that were also involved in the action), Travelers nonetheless added in the letter mentioned above that *"in addition to the reservations previously asserted*, the Travelers reserves its rights to allocate monies" for later expenses (emphasis added). Thus, Travelers effectively reserved its rights to terminate its defense obligations; any argument that Travelers unqualifiedly assented to provid-

---

definition [of occurrence] hinges upon whether the policyholders expected or intended property damage. *See American States Insurance Co. v. Maryland Casualty Co.,* 587 F.Supp. 1549, 1552–54 (E.D.Mich.1984) (Gilmore, J.) (occurrence policy provides no coverage for property damage caused by the insured's regular business

practice of illegally dumping toxic wastes). An occurrence policy containing a pollution exclusion covers property damages caused by pollution only if *both the property damage and the release of pollutants* is unexpected and unintended." 662 F.Supp. at 76 n. 8 (emphasis added).

ing for the defense, or that WIL relied on any such unqualified promise, is not supported by the facts presented in this record. I thus find that Travelers adequately put the defendants on notice of its intention to exercise its rights to terminate its support of the defendants' defense when and if it found that there was no coverage in the policy. Thus, no duty of defense was owed in the MWRA suit.

### 2. The First Republic Suit

■ The gist of the defendants argument that Travelers owed them a duty to defend the *First Republic* suit centers on the presence of sludge in the crawl space underneath two of the buildings leased by WIL. This pollution, asserts WIL, was the result of an "occurrence" as that term is understood in the policy because it was unintended and unexpected; even if the sludge was a result of "leaking or cracking ... [of] sewer pipes running from WIL's premises into the MWRA sewer system," the discharges still fit into the definition of occurrence in the agreement because the sludge was not purposefully or knowingly deposited into the crawl space. WIL argues that even if the pollution in the crawl space resulted from the effects of caustic materials deposited in the sewer lines by WIL which may have worn away the pipe, the resulting damage to the crawl space was not intended.

See *Quincy Mutual Fire Insurance*, 17 Mass.App.Ct. at 907. WIL argues further that neither the pollution exclusion nor the leased property exception applies here to defeat Travelers' responsibility. Furthermore, WIL argues that even if Travelers had no duty to defend the First Republic case on its own merits, a duty arose when the action was consolidated with the MWRA case, an action in which, contends WIL, Travelers had accepted its responsibility to defend.

Travelers' general argument is a simple one—the suit filed by the landlord of WIL and Memory Lane was for damage done to the premises leased by WIL and Memory Lane, and thus fell squarely within the leased property clause, and, furthermore,

sought only declaratory and injunctive relief which is not provided for under the policy even were the suit covered.

Travelers makes several more specific arguments. First, Travelers asserts that it had no duty to defend because First Republic made no mention of any crawl space pollution "or of damage to property other than the leased premises," thus bringing the claims within the leased premises exclusion. Secondly, Travelers contends that, if, as the defendants assert, it never knowingly or intentionally disposed of sludge in the crawl space, does not know how the sludge got into the crawl space, and never leased or controlled the crawl space, then WIL was not legally obligated to pay any damages to First Republic, and therefore Travelers is not required to reimburse the defendants under the contract. Travelers also asserts that the leased property exception applies, in that WIL exercised control over the crawl space, and that the discharges were not unintended or unexpected. As discussed above, for the duty to defend to become operative, the complaint must be reasonably susceptible of stating a claim that falls within the coverage of the policy.

The complaint filed by First Republic appears concerned with the regulatory and statutory violations allegedly committed by the defendants, which are alleged to constitute a breach of the lease with First Republic. However, the complaint does not mention these alleged regulatory violations in outlining the relief sought; First Republic appears to seek redress only for damage done to the buildings leased to the defendants. First Republic contended, for instance, that

> [a]s a result of the release of hazardous materials by the defendants within the area occupied by them as tenants of First Republic at the site, the brick work, steel structure, plaster, floor surfaces, doors, windows and sills and ceiling and piping and electrical conduit therein have become pitted, corroded and partially destroyed.

Complaint, par. 11.

First Republic went on to explain the repair work that must be done to correct the problem at the site by "insulating the public and the general area from the contaminated interior surfaces, and cost of repairing the interior of the building to restore it to the condition as existed at the commencement of the original tenancy." Complaint, par. 12.

First Republic makes no specific mention of the crawl space; nevertheless, WIL contends that the complaint can be construed to include such pollution within its terms, asserting that "[a]t the time the original complaint was filed by First Republic in November, 1984, First Republic was unaware of the existence of a sludge-like material in the crawl spaces located under the two buildings previously occupied by WIL, the cost of the clean-up of which was later sought by First Republic as part of its complaint against the defendants." Defendants' Statement of Material Facts Not In Dispute, ¶ 8. Travelers does not dispute this specific allegation in its response, although it argues elsewhere that no mention is made of the crawl space in First Republic's action.

The fact that First Republic did not know of the crawl space pollution when it filed its complaint may be of some significance in examining the terms used by First Republic in the complaint. Both the original and the amended complaints, presumably filed after First Republic discovered pollution in the crawl space, make general references to "the site", and although cautioning that other damages may be sought in addition those listed in the complaint, seem directed solely at the damage done to the buildings themselves. The standard at issue here is whether the complaint is *reasonably susceptible* of an interpretation calling into play Travelers' duty to defend. Although it is a close question, I do not believe that a jury question is presented as to whether Travelers' duty to defend was implicated here. The complaint is directed to the buildings and the *premises* leased to the defendants. It cannot be fairly read as leaving the door open to First Republic's claiming other kinds of potential damages to property not used, controlled or leased to the defendants. The complaint states that it seeks reimbursement for "correction of the condition created by the defendants' discharge of hazardous materials, and restoration of the Site" and "for the costs of *any* response action to assess, contain and remove the hazardous materials." But it does not state that First Republic was seeking damages for property not included in the leased premises. Travelers' obligations are judged by the allegations in First Republic's complaint, not WIL's interpretation of that complaint. Summary judgment on the issue of Travelers' duty to defend in the *First Republic* case is thus allowed.

### B. *The Duty to Indemnify*

Under the contract, Travelers is obligated to pay all sums that its insured becomes legally obligated to pay as damages for bodily injury or property damage for those occurrences properly covered by the policy. The duty to indemnify is narrower than the duty to defend. *Sterlite*, 17 Mass.App.Ct. at 318 n. 4, 458 N.E.2d 338. Whether or not the insurer must indemnify is determined after trial, "since the facts provided at trial may fall within a policy exclusion, or [the insured] may fail to satisfy certain conditions of the insurance agreement." *Newell–Blais Post ¶ 443, Veterans of Foreign Wars of the United States, Inc. v. Shelby Mutual Insurance Co.*, 396 Mass. 633, 638, 487 N.E.2d 1371 (1986). Here, there was no trial, but a settlement of both suits. The determination of whether the duty to indemnify became operative must thus be made on the basis of these settlements.

### 1. The MWRA Suit

As the discussion of Travelers' lack of duty to defend WIL and Melvin Rosenfeld from the *MWRA* suit should have made clear, the damages alleged by MWRA do not come within the provisions of the insurance contract. Additionally, it is also clear that the amount paid to the MWRA to settle the case represented "civil penalties," not damages. It is beyond per-

adventure that damages are distinct from penalties. The term "damages" refers to the loss suffered by an injured party expressed in a dollar amount. *Turcotte v. DeWitt*, 333 Mass. 389, 392, 131 N.E.2d 195 (1956). Unlike damages, penalties are not designed to compensate an injured party, but are designed to deter conduct deemed undesirable by the legislature. *See Mellor v. Berman*, 390 Mass. 275, 281, 454 N.E.2d 907 (1983) ("Where the legislature has indicated its displeasure with described acts, has sought to deter their commission, and has encouraged vindictive lawsuits if wrongdoing is not stemmed, the imposition of multiple fines and penalties for a violation of statutory requirements is appropriate") (citations omitted). Since the coverage provided by Travelers under the contract is limited to damages, and does not mention penalties, Travelers is not obligated to reimburse WIL and Melvin Rosenfeld, even assuming no other barriers existed to their recovery. Travelers also contends that the pollution exclusion applies to relieve Travelers of any duty to defend the defendants here.[6] *See Gloucester Township v. Maryland Casualty Co.*, 668 F.Supp. 394, 405 (D.N.J.1987) (where the court stated that fines and penalties are not damages within an insurance policy providing coverage for property damage). Travelers' motion for summary judgment on Travelers' duty to indemnify in the MWRA suit is allowed.

### 2. The First Republic Suit

■ WIL and Travelers hotly dispute the responsibility of Travelers in indemnifying WIL for its settlement with First Republic. Travelers presents several arguments to support its contention that it is not liable to indemnify the defendants for the money paid in settlement of the suit brought by First Republic. Travelers asserts that the crawl space pollution is not covered by the terms of the policy; for instance, Travelers asserts that the pollution exclusion, barring coverage for damages caused by pollution released or discharged by WIL where that release or discharge was either expected or intended, applies.[7] This conclusion, asserts Travelers, flows both from the pollution exclusion itself, as well as from the definition of the term "occurrence," defining those events covered under the policy. Travelers also asserts that exclusions in the policy, such as that barring recovery for damage to property used, controlled or leased to the defendants, bars the defendants from recovering from Travelers.

In response the defendants assert that the crawl space pollution was the result of an "occurrence" as that term is used in the policy, arguing for an exceptionally broad definition of the term occurrence, encompassing "literally anything that happens or occurs." *Buckeye Union Insurance Co. v. Liberty Solvents & Chemicals Co., Inc.*, 17 Ohio App.3d 127, 477 N.E.2d 1227, 1233 (1984), *citing Portaro v. American Guarantee & Liability Ins. Co.*, 210 F.Supp. 411, 415 (N.D.Ohio 1962), *aff'd*, 310 F.2d 897 (6th Cir.1962). They further argue that the crawl space does not fall within the leased property exception, nor any oth-

---

**6.** Although Travelers does no+ argue the point, it would also appear that this result would be reached in light of the second subparagraph of the pollution exclusion provision excluding coverage for emissions "resulting from or contributed to by any condition in violation of or non-compliance with any governmental rule, regulation of law applicable thereto." It seems clear that the MWRA sued for and exacted a settlement based upon its allegations that WIL violated several state regulations governing toxic discharges. *See Travelers Insurance Co. v. Dingwell*, 414 A.2d 220, 228 (Me.1980) (finding that the above-quoted section of the pollution exclusion is "applicable only to a condition which in and of itself constitutes a violation of law by its very existence regardless of the presence or absence of injurious consequences"). Indeed, in its petition for declaratory judgment, Travelers cites this exclusionary paragraph without citing the subparagraph concerned with violations of state law, suggesting that the version of the policy upon which Travelers relies is different from that submitted as an exhibit in this action.

**7.** Travelers strongly intimates that WIL is responsible for the sludge found in the crawl spaces, a point which the defendants, with equal vehemence, deny. I need not attempt to resolve this issue, as this case can be determined on other grounds on summary judgment.

er exclusion, and should properly be covered by Travelers.

I find that this portion of this case turns on the issue of the use made or the "control" exercised by the defendants over the property here. Under the contract, Travelers is not responsible for damages to property owned, occupied, rented to, used by, or in the care, custody or control of the insured. I find that the application of this provision is determinative of this case.

Under the facts here, WIL may be able to make some argument that the presence of sludge in the crawl spaces came as a surprise, and thus the depositing of that sludge was an "occurrence" within the meaning of that term under the agreement; it appears that this argument is more tenable, although clearly not airtight, than that made with regard to the pollution at other points at the site.[8] Even were I to accept WIL's argument that the pollution resulted from an unexpected event (the rupture of a sewer line), it still seems clear that the crawl space was land over which the defendant used or had exercised control. The parties dispute whether or not the lease included the crawl space,[9] although it appears that WIL only leased the sub-basement to Building 16, and not to Buildings 18 and 19, although pipes led from the first floor of Building 19 into the crawl space. Nevertheless, several facts indicate the defendants used or controlled the crawl space. The sole access to the crawl space

was through WIL's premises. WIL had some plumbing work done in the crawl space: WIL had a steam leak in a pipe in the crawl space under Building 18 repaired, and installed some piping and a sump pump in the crawl space. WIL also did some work to the floor and sub-floor of Building 18 to support a zinc plating machine. It thus appears that WIL used the crawl space. Furthermore, WIL's exclusive access to the crawl space, and its use of the crawl space demonstrate the defendants' potential and actual control over this property. It is thus within the leased property exemption. Liability insurance is designed to provide compensation for damages to property not owned or controlled by the insured, *Crane Service & Equipment Corp.*, 22 Mass.App.Ct. at 668, 496 N.E.2d 833; Travelers is thus not obligated to provide compensation to WIL for losses occurring to the leasehold property itself.

WIL also asserts that the sludge may not have been produced by its operation as evidenced by the chemical composition of the sludge, the appearance of the breaks in the pipes, and the fact that other tenants of First Republic used chemicals similar to those used by WIL, concluding that others may be responsible for the pollution. Despite these allegations, I find that they do not alter the conclusion that Travelers is not obligated to indemnify the defendants under the contract. WIL accepted the policy at issue here with the leased property

---

**8.** Travelers, in a letter to this Court, has requested that I consider the applicability of a recent case, *Newton v. Norfolk & Dedham Mutual Fire Insurance Co.*, 26 Mass.App.Ct. 202, 525 N.E.2d 685 (1988). In that case, the appeals court appears to rule in *dicta* that one need not intend the full effect of the damage that occurs as the result of an intentional act for the results of the act to still be considered intended, as long as some injury was intended. The defendants have requested an opportunity to respond to this submission. Since I decide this aspect of the case on other grounds, I need not delay resolution of the pending motions by waiting for the defendants to respond, as I find that I need not explore the applications of the *Newton* case here.

**9.** Travelers cites *Sanford v. Belemyessi*, 362 Mass. 123, 124–25, 284 N.E.2d 588 (1972) for the proposition that where a tenant had exclusive

access to a part of a building and had exercised some dominion over it, the tenant should be deemed to have control over it despite the fact that he periodically allowed others to make use of that part of the building. In *Sanford*, however, the property at issue "was part of the demised premises. No one but the [tenant] had the right to use it." *Id.* at 125, 284 N.E.2d 588. In this case, it is disputed whether the crawl spaces were leased to WIL. *Cf. Derman Rug Co., Inc. v. Ruderman*, 4 Mass.App.Ct. 437, 443 & 444, 350 N.E.2d 727 (1976) ("When a lease is executed for part of a building, pipes encased in walls or embedded in floors are normally within the landlord's exclusive control ... In a lease of a basement of a building where the upper floors were let to other tenants, the land under the building is not part of the leased premises"). The *Sanford* case is of little help in resolving the issues presented by the motions here.

provision within it. It thus ran the risk of subjecting itself to liability by not taking some action to protect its rights with regard to the crawl space, knowing that it at least ran a risk of incurring liability because of the leased property exception. WIL may have rights against other polluters of this space, but it has no rights against its insurer on these facts.

One further note is in order. Little evidence concerning the crawl space under Building 19 has been presented to this Court to determine its status in these proceedings. In its pleadings, Travelers merely asserts that pipes led from the first floor of Building 19 into the crawl space. There is, thus, little direct evidence that the defendants used or controlled this space. However, one of the leases, dated May 27, 1974, states that the "basements" of Buildings 16, 17, 17–A, 18 and 19 were rented to the defendants. In paragraph 30 of the lease, the tenant is permitted to make use of the "sub-basement" of Building 16. I believe a fair reading of the entire record and the lease specifically permits a conclusion as a matter of law that the defendants rented this part of the building as well. Indeed, it would be difficult to explain to what other use this space could be put.

### 3. Other Contentions Regarding Both Suits

■ WIL also complains that Travelers should be required to indemnify it on three separate theories. First, WIL contends that Travelers breached its duty to defend WIL, and thus should not be allowed to refuse to provide compensation at this point. As discussed above, Travelers did not breach this duty with regard to the *First Republic* suit. In any event, the defendants' argument that a breach of the duty to defend automatically results in liability on the substantive issues of the case thus triggering a duty to indemnify is not supported by governing law in Massachusetts. As mentioned above, the Supreme Judicial Court has held that the duty to defend is distinct from the duty to indemnify. *Newell–Blais*, 396 Mass. at 638, 487 N.E.2d 1371. It has also held that an insurer who breaches his duty to defend is

bound by the judgment reached in the suit; as the Supreme Judicial Court explained in *Miller*, "[w]here an action against the insured is ostensibly within the terms of the policy, the insurer, whether it assumes the defense or refuses to assume it, is bound by the result of that action as to all matters therein decided which are material to recovery by the insured [against the insurer] in an action on the policy ... an indemnitor, after notice and an opportunity to defend, is bound by material facts established in an action against the indemnitee." (citations omitted). The Court explained that the object of a policy in which the insurer promises to pay damages and defend any actions is to protect against law suits and legal liability. "This object could not be obtained if the insured were compelled to try over again in an action against the insurer the same issues upon which he has been found liable in the original action." 291 Mass. at 448, 197 N.E. 75.

In this case, the defendants have not gone to trial. There are thus no material facts established, nor any judgment, to be held against Travelers. The fear expressed by the Supreme Judicial Court in *Miller*—that an insured will have to retry issues already tried to conclusion against a third party in a subsequent action against its insurer—is not a possibility here. I thus find that Travelers is not bound by the settlement reached in the *First Republic* suit merely by its failure to fulfill its duty of defending.

WIL next argues that Travelers should be estopped from denying coverage because, at least with respect to MWRA's suit, Travelers had allegedly agreed to provide for the defense. As discussed above, I have already found that this contention lacks merit.

■ WIL also argues, however, that Travelers should be estopped from denying liability because it was aware of the pollution situation long before the two suits underlying this action were filed. The core of WIL's argument is captured by the following language from one of its pleadings on the matter:

Travelers was fully conversant with the nature of WIL's operation well over four years before it wrote its first CGL policy. It knew on February 20, 1975 that pretreatment equipment had not been installed and that the operation used or generated a variety of materials which were discharged into the sewer system. Despite this knowledge, Travelers accepted the risk in 1979, without ever conducting a reinspection. Moreover, Travelers inspected for pollution-related concerns only once during five years of coverage. By accepting insurance premiums from the defendants, Travelers led the defendants to believe that WIL's operations were covered. Travelers, therefore, is estopped from asserting any grounds for denial without which it knew or should have known when coverage was first written and subsequently renewed.

Memorandum in Support of Defendant's Motion for Summary Judgment at 48. I find this argument irrelevant. Travelers' knowledge of WIL's pollution control methods—or lack of them—has nothing to do with the grounds upon which these motions have been disposed of at this point. Moreover, the argument conflicts with the defendants theory of causation regarding the crawl space pollution. They vociferously argue that the pollution for which they seek recovery is that which occurred allegedly by the accidental depositing of wastes into the crawl space beneath two buildings, and not the intentional pollution as alleged by the Commonwealth in its suit. There is no allegation that Travelers accepted the risk of this supposedly fortuitous event. Thus, I find that whatever force the defendants' argument may have in countering Travelers' assertions on other points in this suit, it has no bearing on Travelers duty to indemnify the defendants with regard to the *First Republic* suit.

### C. *Chapter 93A Claim*

Lastly, WIL alleges that Travelers should be held liable under the Consumer Protection Act, chapter 93A of the Massachusetts General Laws, and has moved for summary judgment on the issue. They contend that Travelers engaged in unfair and deceptive claim settlement practices in violation of both chapter 93A and chapter 176D, § 3, subsection 9, of the Massachusetts General Laws. Travelers also moved for summary judgment on this aspect of the case.

Section 2 of chapter 93A prohibits unfair or deceptive acts or practices in the conduct of any trade or business. Section 11 provides a cause of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property ... as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice ..." Chapter 176D, § 3, lists those claim settlement practices considered unfair. The Supreme Judicial Court has held that an insured can bring a chapter 93A claim against an insurer for improper claim settlement practices. *Dodd v. Commercial Union Insurance Co.*, 373 Mass. 72, 81–82, 365 N.E.2d 802 (1977). While Chapter 176D, § 3, has found application through the more general provisions of Chapter 93A, it provides no private right of action. *See Noyes v. Quincy Mutual Fire Insurance Co.*, 7 Mass. App.Ct. 723 n. 1 & 726–27, 389 N.E.2d 1046 (1979). Chapter 93A provides a full and complete remedy for unfair claim settlement practices.

Summary judgment in this area of unfair and deceptive practices is particularly difficult because the statute speaks in terms of "reasonableness", a judgment generally reserved for the fact finder.[10] Therefore, the defendants' 93A claims must be examined in detail.

Specifically, the defendants contend that Travelers: (1) agreed to defend the *MWRA* case, but did not provide a defense in the form of a monetary contribution to the defendants until some 14 months after the

---

**10.** Claims for violations of Chapter 93A are not entitled to a jury trial. *NEI v. Burley,* 388 Mass. 307, 446 N.E.2d 674 (1983).

commencement of the suit; (2) that Travelers led the defendants to believe that it would defend both the *MWRA* and *First Republic* suits after the two were consolidated in August, 1985; (3) that Travelers only paid part of its defense obligation without providing an explanation for why it failed to pay the rest; and (4) that Travelers waited eight months after making its first defense payment before commencing this declaratory action. Travelers makes several counter-arguments. First, it asserts that it was not obligated to provide a defense based on an examination of the complaints filed in the two underlying actions; that Travelers discontinued its participation in the defense based upon the advice of an experienced attorney who had been retained by Travelers to conduct an analysis of the cases; that, up until the time it withdrew from defending the *MWRA* case, it fully paid its defense obligations; and that the defendants incurred no damage by the alleged delay or failure to make defense payments since the defendants had retained their own counsel throughout the proceedings. I take those contentions in order.

In its statement of undisputed facts, the defendants stated that they first wrote to Travelers on January 7, 1985, providing them with the complaint in the *First Republic* case as well as the draft complaint from the *MWRA* case, and that Travelers made no response, prompting the defendants to contact Travelers on April 16, 1985. The defendants further allege that Travelers' first response to this suit was a letter dated April 23, 1985. In support of this contention, the defendants cite the original letter sent to Travelers informing them of their claim. Travelers responds that this letter does not establish that Travelers failed to acknowledge or respond to the defendants' letter by April 16th, although Travelers does not affirmatively assert that it had done so.

Although it is a close case, I do not believe a fact finder could conclude that a delay of thirteen or fourteen weeks was unreasonable on this record. The statute requires an insurer to acknowledge "*and* act" reasonably promptly. It was certainly necessary that Travelers, which was conducting an investigation into this case, delay its response until it had enough information to take some action. The case was complicated, implicating statutory and regulatory violations, and there was a long history of waste discharges by the defendants that required review. Travelers did conduct an extensive review of the factual and legal circumstances of this case and it cannot be said on this record that it failed to act properly on this claim.

The defendants also argue that although Travelers promised to provide at least an interim defense in the April 23 letter, no payments were forthcoming until June of 1986. They further allege that eight months after making this payment, Travelers filed suit here, almost two years after agreeing to provide a defense, although they admit that Travelers later made two additional payments to the defendants. Again a delay of two years in making the first payment and a later delay of eight months was not unreasonable, in light of the foregoing discussion and Travelers reservation of rights. Travelers indicated it would take action, and had ensured through its reservation of rights that it would not be prejudicing its options by doing so. While this was a long delay, Travelers was entitled to make the complete investigation required before it took a definitive position. It cannot be said to have acted unfairly and deceptively for doing so.

The defendants also assert the delay of eight months between the time Travelers contributed to the defense of the *MWRA* case and the time this declaratory action was filed and Travelers' alleged failure to affirm or deny coverage after First Republic filed its amended complaint was improper.

With respect to the *First Republic* case, Travelers did not respond to the defendants' request for defense, filed on January 7, 1985, until April 23, 1985. As stated above, this delay was reasonable. Furthermore, one month after the amended complaint was filed in that case, Travelers filed this action, clearly to serve as notice that

Travelers would not be undertaking the defense of that action. A one month's delay is not an unreasonable period. With regard to the *MWRA* suit, Travelers was in the process of conducting an investigation of the claim in the *MWRA* case before it filed this action; thus, its delay was not unreasonable.

The defendants also assert that Travelers "refuse[d] to pay claims without conducting a reasonable investigation based upon all available information." With regard to the *MWRA* suit, Travelers offers two responses to this—first, that it paid its full share of all of the legal fees it believed it owed in defending that suit, and, second, that it referred this case to an experienced attorney for investigation. Travelers also asserts that it thoroughly reviewed the allegations in the *First Republic* suit before denying coverage for it.

The record is equally convincing here. Travelers' retention of an attorney, and his review of the case, prior to Travelers exercising its option to cease supporting the defense constitutes a reasonable investigation. Little more can be expected of an insurer than what Travelers did here. Travelers liability to indemnify was not reasonably clear in the *First Republic* case at any prior point, and, similarly, its right not to indemnify the defendants in the *MWRA* suit was reasonably clear.

It was not reasonably clear that Travelers was required to defend in the *First Republic* suit. The defendants appear to argue that Travelers did not promptly provide payments for the defense in the *MWRA* suit, but these allegations do not appear actionable here, since liability was not reasonably clear in that case as well.

Finally, Travelers argues that it promptly informed the defendants of the reasons why it would not defend the *First Republic* suit. See Supplemental Affidavit of William Corbett, par. 6 (Travelers informed the defendants in writing on April 23, 1985 that the First Republic suit was not covered because "the complaint was for declaratory and injunctive relief for pollution damages to property leased to or under the care, custody and control of Waltham Industrial, which is expressly excluded by the policy"). Its explanation for not responding to the amended complaint came in the form of this action, filed about a month after the amended complaint was submitted to Travelers. With regard to the *MWRA* suit, Travelers relies upon the two letters sent to the defendants which outline the general reasons that it would cease providing a defense to the defendants, and this declaratory action, filed shortly after it received the report of the attorney retained to investigate this case and determine if Travelers should continue to provide a defense under the terms of the insurance contract. Again, its actions in this regard cannot be held to be unfair and deceptive.

In summary, there is no version of the defendants that would support a finding in their favor on the Chapter 93A claim. A careful, independent investigation of complicated factual and legal circumstances was required and appropriate. Travelers advised the defendants of its position and its position was based on a plausible interpretation of the contract. *Gulezian v. Lincoln Insurance Co.*, 399 Mass. 606, 613, 506 N.E.2d 123 (1987). The defendants were represented by their own counsel from the beginning of the litigation until the cases were settled and Travelers paid its share of the legal fees incurred before this lawsuit was filed. Since it reasonably felt it had no duty to defend, its refusal to pay environmental consultant fees was not unfair or deceptive.

### Conclusion

Accordingly, and for the foregoing reasons, Travelers' motion for summary judgment on the issue of its duty to defend is ALLOWED as to the *First Republic* suit and the *MWRA* suit. Travelers' motion for summary judgment on the issue of its duty to indemnify is ALLOWED as to the *First Republic* suit and the *MWRA* suit. Summary judgment on the Chapter 93A claim is to be entered for Travelers.

SO ORDERED.